IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 20, 2001 Session

**STATE OF TENNESSEE v. MICHAEL A. MILLER**

**Direct Appeal from the Criminal Court for Cumberland County**
**No. 5417     Lillie Ann Sells, Judge**

_____

**No. E2000-00930-CCA-R3-CD**
**May 8, 2001**
_____

The defendant was convicted in the Cumberland County Criminal Court of aggravated sexual battery of a seven-year-old boy.  Following the trial court's denial of his motion for a new trial, the defendant filed an appeal as of right to this court, raising three issues:  (1) whether the evidence was sufficient for a rational trier of fact to find him guilty beyond a reasonable doubt of aggravated sexual battery; (2) whether the trial court abused its discretion in denying his motion for a new trial, based upon newly discovered evidence; and (3) whether the trial court erred in failing to instruct the jury on lesser-included offenses.  Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

John B. Nisbet, III; David N. Brady, District Public Defender; and Cynthia Lyons, Assistant District Public Defender, Cookeville, Tennessee (on appeal) and Anthony Turner, Crossville, Tennessee (at trial) for the appellant, Michael A. Miller.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; William Edward Gibson, District Attorney General; and Anthony J. Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Cumberland County Criminal Court jury convicted the defendant, twenty-nine-year-old Michael A. Miller, of aggravated sexual battery of a seven-year-old boy, a Class B felony, and imposed a $10,000 fine.  The trial court sentenced him to nine years, at 100% as a violent offender, in the Department of Correction.  Following the trial court's denial of his motion for a new trial, the defendant filed a timely appeal to this court, presenting the following three issues for our review:

I. Whether the evidence was sufficient to find the defendant guilty of aggravated sexual battery beyond a reasonable doubt;

II. Whether the trial court abused its discretion in failing to grant the defendant's motion for a new trial, based upon newly discovered evidence; and

III. Whether the trial court erred in failing to instruct the jury on lesser-included offenses.

Based upon our review of the record and of applicable law, we affirm the judgment of the trial court.

## FACTS

On March 8, 1999, the Cumberland County Grand Jury indicted the defendant, charging him with aggravated sexual battery of the seven-year-old victim, C.W.,[1] for his actions while visiting in the victim's home on the evening of December 22, 1998. Trial was held on November 10, 1999. The victim's father, Jerry Lee Watchorn, testified that the defendant, with whom his family had become acquainted through church, had been a frequent visitor to their home, regularly dropping in for supper, or to do his laundry. He said that the defendant had offered, "at least six or seven times" to let their two youngest children, C.W. and his six-year-old brother Darius, spend the night at his apartment as a reward for doing well in school, but that he had refused, feeling uncomfortable about having the boys stay with anyone other than family.

Watchorn testified that on the evening of December 22, 1998, he and his wife had taken their daughter to Knoxville for medical treatment, leaving the victim and Darius in the care of their older stepbrother, seventeen-year-old Matthew Erickson ("Matt"). When they returned, the younger children were in bed, and Matt was watching television. Nothing appeared unusual. Three days later, however, C.W. told him of what had occurred during their absence, and Watchorn notified the authorities. Watchorn said that he had never known of either the victim or Darius engaging in any inappropriate acts with each other.

The victim testified that the defendant had stopped by his home after his parents and sister had left the house. Matt told him and Darius to go to bed, and he went upstairs and lay down on his bunk bed, in the bedroom that he shared with his brothers. After he was in bed, the defendant came into the room and touched the "front part of [his] privates," the part of his anatomy that he "used the bathroom out of." The victim said that the touching occurred "below" the covers, his pajamas, and his underwear, and that the defendant had "licked it." The defendant had continued the touching

---

[1] It is the policy of this court to refer to minor victims of sexual abuse only by their initials.

until he heard Matt coming up the stairs to the bedroom. The victim said that the defendant had told him not to tell his parents, but that he had eventually told his sister, and then his mother and father.

On cross-examination, the victim acknowledged that the defendant had played games with him and his younger brother whenever he came to the house. He said that he had been covered with a blanket that night, and the defendant had not tried to remove his clothing. The victim had no memory of having ever walked in on Matt and his girlfriend while they were kissing or touching in the bedroom.

Matt testified that the defendant had been in the habit of dropping by their house at least once a week. He had shown up at about 7:00 on the evening of December 22, 1998, while Matt was home alone with his two younger brothers. They had all sat and watched movies until about 7:30 p.m., when Matt told his brothers to go to bed. Shortly after the boys had gone upstairs, the defendant had followed them up, stating that he was going to tuck them in. Approximately thirty minutes later, Matt went upstairs because he could still hear them moving around in the room.

When Matt entered the bedroom, Darius was in his top bunk, and the defendant and C.W. were on a foldout bed or mattress on the floor. He testified that "[t]here was a cover over [the defendant] and my younger brother [C.W.]. [The defendant] popped up and said, 'Oh God, we are in trouble.'" Assuming that the defendant was merely referring to the fact that "the boys were still up and he was up there fooling around with them," Matt thought nothing of the defendant's statement, and lay down on his bed. The defendant "came over," "hopped in [his] bed with [him]," and sat down to talk, while C.W. got up and into his bottom bunk. According to Matt, the defendant "talked about the fact that he had come over to see how we were doing and he kind of made the comment, you know, that I was kind of a big boy, and then he made the comment about what would it take to get a guy like me." After making this remark, which Matt found inappropriate, the defendant went back to small talk. A minute or two later, he and the defendant got up and went downstairs, and the defendant left.

On cross-examination, Matt admitted that he and the defendant had been "pretty good friends" before the incident, and that they had sometimes discussed "teenaged things" such as girlfriends. The defendant had often been at their home at bedtime, and there was nothing unusual about him going upstairs to tuck the boys into bed. Matt testified that the light of the bathroom adjoining the boys' bedroom was on as he went upstairs, and the bedroom door was open. The defendant had been clothed. He had noticed nothing unusual about either the defendant's or C.W.'s appearance when they had emerged from the covers.

Matt acknowledged that, prior to the incident, his younger brothers had, at times, "peek[ed] around the corner" at him and his girlfriend when they were together in the bedroom, "to see what [they] were doing." He denied, however, having ever had sexual relations with his girlfriend in the bedroom, or having confided to the defendant that the victim had caught him engaging in sexual activity with her. On redirect, he testified that he had never seen the victim engage in any inappropriate activity with Darius.

Officer Mark Jeffrey Rosser, a detective lieutenant with the Crossville Police Department, testified that he had interviewed the defendant as part of his investigation of the case. After being informed of his rights, and signing a waiver of rights form, the defendant provided the following written statement, which Officer Rosser read at the request of the State:

> Me and the kids went upstairs. Matt stayed downstairs. Both kids were on the bottom bed. I was on the bed beside [C.W.]. My head was on his pillow and we were talking about things in general and just laughing and telling jokes et cetera. When [C.W.] reached out and grabbed his brother's crotch or private parts, I immediately calmed him down and said not to do that. Even Darius did as well. I kept telling Darius to get on the top bed. He always sleeps up there. He says that he doesn't anymore. So, he stayed on the bottom with [C.W.]. Darius and [C.W.] were picking at each other as they normally do. [C.W.] once again grabbed his brother's private parts. I once again told him not to do that, that it was ugly and he shouldn't do that. I suppose by now thirty minutes had passed. I thought it was strange that Matt hadn't been upstairs yet. I knew it was getting late and the boys should be asleep. So, I moved to the center of the room on the floor. There was a fold out cushion on the bed, so I laid there. I remember it being cold on the floor. Within minutes, the boys were on the floor with me. They brought blankets and pillows et cetera. It was just seconds until Darius was up around my neck and I was holding him like I had many times before. Then, [C.W.] said I loved Darius more than I did him, so [C.W.] pushed him off and got up around my neck and I held him for a minute or two. When Darius got back around my neck, then [C.W.] pushed him off again and clamped back around my neck. As I was holding him at this time, he began to move further down my body closer to my legs, but I still didn't think anything was wrong. He then moved further down and in the process he started licking or kissing on my chest. Then, he started to lift my shirt. By this point, I knew something was wrong. I thought what is he doing and how does he know these things at his age. I then immediately pushed him up into the air and put my legs together to my chest to get some distance between the both of us. I tried to take his attention elsewhere. While he was there, I started playing like it was an airplane. At that point, Darius was beside me on the floor and said he wanted to ride the airplane. Then, Matt walked in and I said, "Oh boys, we are in trouble." I knew Matt would be mad and I didn't want him to spank them. He does really hard. They were already supposed to be in bed. He came in and got on his bed after turning on the light in the bedroom. Then, I got on his bed and me and him talked about his girlfriend and we joked and cut up just as we had

done many, many times before all in good fun. Then, we went downstairs and I left shortly thereafter. This is all I can remember.[2]

At trial, the defendant took the stand in his own behalf, stating that he had visited in the Watchorn family home once or twice a week, and had tried to build a relationship with "each and every one of them in the family." He often played games with the younger boys, or helped them with their homework. He and Matt had become friends, and had discussed "teen things or whatever," things that Matt knew that the defendant would not tell his parents, because "you can tell things to like big brothers that you can't tell to your parents or whatever." The defendant said that it was during one of these conversations that Matt told him that he thought his younger brothers had "caught his girlfriend giving oral sex to him." The defendant stated that during his interactions with the family, he had noticed that the older children were "authoritative over the other children," and that he had once seen Matt spank Darius, "pick[ing] him up off the floor with his hands."

The defendant testified that he had gone to the Watchorn home around 7:00 p.m. on December 22, 1998, after first stopping by the beauty salon where Mrs. Watchorn worked, to tell her that he would check on the children while she and her husband were in Knoxville with their daughter. When he arrived at the home, he sat for approximately fifteen minutes watching television with Matt and the younger boys. Matt sent the younger boys to bed, and he followed approximately ten minutes later in order to tuck them into bed. In the bedroom, where he found both boys in the bottom bunk, he lay on the floor beside the bunk bed, with his head on C.W.'s pillow. Placing his hand on C.W.'s chest, he talked to him about school and "things in general." As they talked, C.W. kept "bugging his brother," twice grabbing at Darius's crotch. Both times, the defendant told him to stop, and that it was "ugly." Realizing that the boys were not going to sleep, the defendant moved to a foldout futon bed in the middle of the floor. Both boys soon joined him on the futon, with C.W. on one side and Darius on the other. The defendant described what ensued, as the boys began vying for his attention:

> At that point, that is when Darius got up around my neck. Of course, he had done that many times before. Like when I would be sitting there beside him, he would crawl all the way up to get to me and [C.W.] would be sitting over here on this leg. That is just the way they are to me. [C.W.] said, "Oh, you love him more than you do me." I said, "No, I don't." So, I got [C.W.] and I hugged him. This went on for a few minutes or whatever, you know, that little sibling rival [sic]. So, [C.W.] . . . I don't know. It was like he got agitated, like he was getting upset. So, he gets up on top of me. But even at that point, it is wasn't [sic] anything offensive, or I didn't feel that it was offensive because I had no reason to. Then, of course, Darius was laying [sic] there beside me. [C.W.] started to do things

---

[2]There are minor variations between the statement as written and as it is reproduced in the transcript from its being read to the jury.

that I knew that . . . It was like, "Oh God, this is not what I need to do."

The defendant said that Matt walked into the room just as he had pushed the victim up and away from his body into an airplane ride on his shins. He got the victim off him and said, "Oh God, kids, we are in trouble," knowing that Matt would be upset that the boys were not in bed. He jumped up and lay down on Matt's bed, Matt jumped over him and got into bed, and the boys got up and into their bed. He and Matt then sat for a while, talking and joking and kidding each other, as they often did. He explained that his comment about what would it take to get a guy like Matt had been a joke, made in the context of talk about Matt's girlfriend and dating. After talking about ten minutes, he and Matt got up and went downstairs. He left shortly thereafter.

The defendant stated that he had later run into Mrs. Watchorn and her daughter at the mall, but that they had refused to speak to him. He called their home and the salon, to have them hang up on him. He went to their house, where Matt met him at the front door and told him of the victim's accusations. The defendant testified that he had never asked that the victim and Darius be allowed to spend the night at his apartment. Instead, he had volunteered to babysit the boys at their house, with their older siblings present, so that their parents could have a night alone together.

On cross-examination, however, the defendant admitted that he had told the younger boys that they could come spend the night at his apartment as a reward for keeping their room clean, if their father agreed. He acknowledged that he had said nothing, in his statements to police, of Matt's revelation that the victim had caught him and his girlfriend engaging in sexual activity. He said that he had not thought it relevant. He had not reported Matt's spanking of Darius to authorities, despite his belief that it had constituted abuse, because he had not wanted to get involved. He had not told Matt or his parents of the victim's grabbing at Darius's crotch, because in his experience that kind of behavior was common among children their age. He had not told Matt about the victim's lifting of his shirt, and kissing and licking of his chest. When asked if he was testifying that the victim, a "little boy," had molested him, he answered "yes." He denied that he had ever touched the victim's penis, or engaged in any other inappropriate contact.

On redirect, the defendant explained why he had not told the victim's family of the victim's alleged inappropriate behavior that evening:

> The reason why I didn't go to Jerry and his wife was because I didn't want them to feel different toward me, or they may have said just that I had done this or whatever. That is why I went to my family. I said something is going on in this home. Something has happened to these children.

Following deliberations, the jury found the defendant guilty of aggravated sexual battery, and imposed a $10,000 fine. The trial court sentenced him to nine years in the Department of Correction.

The defendant filed a motion for a new trial, based in part on newly discovered evidence. This evidence consisted of testimony by the defendant's ten-year-old niece and a school friend that, after the trial, the victim had laughed at the niece, saying "Ha, ha, ha, ha, your uncle is in jail," and testimony by the niece that she had asked the victim, "Is this true?" and that he had answered, "No, none of this is true." Finding that the evidence was not material, and would not have changed the outcome of the trial, the trial court denied the motion. The defendant filed a timely appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant contends that the evidence presented at trial was insufficient as a matter of law for the jury to find him guilty of aggravated sexual battery beyond a reasonable doubt. Specifically, he argues that no proof was presented at trial to show that he touched the victim for the purpose of sexual arousal or gratification, a necessary element to the offense of aggravated sexual battery. In response, the State argues that the jury, using its common knowledge and experience, could reasonably infer that the defendant's fondling and licking of the victim's penis was for the purpose of sexual arousal or gratification.

Our standard of review when the sufficiency of the convicting evidence is challenged on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992). All questions involving the credibility of the witnesses in this case, the weight and value to be given the evidence, and all factual issues are resolved by the jury, as the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated sexual battery is defined in Tennessee Code Annotated Section 39-13-504(a) as "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances . . . (4) [t]he victim is less than thirteen (13) years of age." "Sexual contact," as defined in Tennessee Code Annotated Section 39-13-501(6), includes "the intentional touching of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1997).

Taken in the light most favorable to the State, the evidence in this case, in the form of direct testimony offered by the victim, showed that the defendant touched and licked the victim's penis. The victim testified that the defendant began touching him approximately five minutes after entering the bedroom, where he was alone with his six-year-old brother, and that he continued the touching until he heard the victim's older brother coming up the stairs. The victim further testified that the defendant told him not to tell his parents about the activity. Further evidence offered at trial showed that the defendant knew that the victim's parents were out of town for the evening, and that he offered to go alone to tuck the children into bed while their older brother stayed downstairs to watch television. Given the nature of the contact, with the defendant fondling and licking the victim's penis, and the circumstances surrounding the encounter, with the victim's parents away from home, the defendant abruptly breaking off the encounter upon hearing the victim's older brother coming up the stairs, and the defendant's instructions to the victim not to tell his parents what had occurred, the jury could reasonably construe that the defendant intentionally touched the victim's penis for the purpose of sexual arousal or gratification. See State v. Hayes, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995) (noting that intent in sexual battery cases is often proved by circumstantial evidence, including conditions under which the touching occurred); see also State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) ("We recognize that jurors may use their common knowledge and experience in making reasonable inferences from evidence."). Thus, we conclude that the evidence was sufficient for a rational trier of fact to find the defendant guilty of aggravated sexual battery beyond a reasonable doubt.

## II. Denial of Motion for New Trial

Next, the defendant contends that the trial court abused its discretion in denying his motion for a new trial based on newly discovered evidence that after the trial, the victim taunted the defendant's niece at school, saying "Ha, ha, ha, ha, your uncle is in jail," and "none of this is true." The defendant argues that this evidence was material, and would have likely changed the jury's verdict if it had been offered at trial. The State disagrees, arguing that the trial court acted within its discretion in denying the motion, based on its findings that the evidence was not material and would not have changed the outcome of the trial.

When a defendant seeks a new trial based on newly discovered evidence, he must show (1) reasonable diligence in seeking the newly discovered evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Whether or not to grant a new trial based on newly discovered evidence, however, lies within the sound discretion of the trial court. See State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997), perm. to appeal denied (Tenn. 1998) (citing Hawkins v. State, 220 Tenn. 383, 417 S.W.2d 774, 778 (1967)). We review this issue, therefore, for an abuse of discretion.

At the hearing on his motion for a new trial, the defendant presented the testimony of two fourth grade classmates who attended the same school as the victim. Lekeshia Martin, the defendant's ten-year-old niece, testified that she was in the fourth grade at the same school where

the victim, a third grader, "sat below" her in gym during "bus duty." One day in gym, she said the victim had teased her, laughing and saying, "Ha, ha, ha, ha, your uncle is in jail," and "none of this is true." On cross-examination, however, Lekeshia revealed that the two statements had occurred at different times, with the victim laughing and saying "Ha, ha, ha, ha, your uncle is in jail"one day, and "No, none of this is true," the following day, after she asked him either, "Is all this true?" or "Is all that true about my uncle?"

The defendant's second witness, nine-year-old Kelly Brumbalough, testified that she was friends with Lekeshia and had played with the victim. She said that she had overhead the victim teasing Lekeshia, laughing and saying, "Ha, ha, your uncle is in jail." She had not heard the victim speak to Lekeshia again.

Considering and rejecting the above testimony as grounds for a new trial, the trial court stated:

> And the reason the Court finds that it doesn't even meet the level of material evidence is because the statement by the child that the victim said, "Ha, ha, ha, your uncle is in jail or in prison" really has nothing to do with any material issue in this case.
>
> The statement that she said that she asked him, "Is it true?" And he said, "No, it's not true." What does that mean? Is what true? This witness didn't testify about what was true. She said, "Is all of this true?" And he said, "No, none of this is true"and started laughing.
>
> I don't even find that that is material evidence in this case. Even if some Court somewhere does find it to be material, I find that this evidence would not have changed the verdict in this case had the jury heard this testimony and it had been used to contradict or attempt to discredit the victim in this case.

"When it appears that the newly discovered evidence can have no other effect than to 'discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness,' the trial court should not order a new trial 'unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing that a different result at trial would necessarily follow.'" Caldwell, 977 S.W.2d at 117 (quoting State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985)). We agree with the trial court that the newly discovered evidence in this case, consisting merely of the defendant's niece's testimony regarding a taunting remark made by the victim to her, followed the next day by his ambiguous answer to her ambiguous question, was not material, and that it would not have changed the outcome of the trial. We conclude, therefore, that the trial court did not abuse its discretion in denying the defendant's motion for a new trial.

### III. Trial Court's Failure to Instruct Jury on Lesser-induded Offenses

The final issue raised by the defendant is whether the trial court erred in failing to instruct the jury on the proper lesser-included offenses to aggravated sexual battery. Citing State v. Swindle, 30 S.W.3d 289 (Tenn. 2000), the defendant contends that the trial court committed reversible error in its failure to instruct the jury on Class B misdemeanor assault, and its failure to instruct on any other lesser-included offenses.

The State concedes that, under Swindle, Class B misdemeanor assault is a lesser-included offense of aggravated sexual battery. It argues, however, that the trial court did not err in failing to give instructions on Class B misdemeanor assault because the evidence presented at trial did not support a charge on the lesser offense. We agree.

In Swindle, our supreme court applied the Burns test[3] to conclude that Class B misdemeanor assault, defined as intentional or knowing physical contact with the person of another that a reasonable person would regard as extremely offensive or provocative, see Tenn. Code Ann. § 39-13-101(a)(3) (1997), is a lesser-included offense of aggravated sexual battery.[4] Id. at 292. The Burns court made clear, however, that the inquiry does not end with a determination that an offense is a lesser-included offense of the charged offense:

> Whether a lesser-included offense must be charged in jury instruction is a two-part inquiry. First, the trial court must apply the new test to determine whether a particular lesser offense is included in the greater charged offense. If a lesser offense is not included in the offense charged, then an instruction should not be given, regardless of whether evidence supports it. If, however, the trial court concludes that a lesser offense is included in the charged offense, the question

---

[3]This test for analyzing lesser-included offenses states, in pertinent part:

> An offense is a lesser-included offense if:
> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
> > (1) a different mental state indicating a lesser kind of culpability; and/or
> > (2) a less serious harm or risk of harm to the same person, property or public interest[.]

State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999).

[4]The Swindle court determined that Class B misdemeanor assault met the definition of a lesser-included offense to aggravated sexual battery under part (b)(2) of the Burns test, concluding that "the element of extremely offensive or provocative touching establishes a less serious harm to the victim than touching for the purpose of sexual arousal or gratification." 30 S.W.3d at 293.

remains whether the evidence justifies a jury instruction on such lesser offense.

Burns, 6 S.W.3d at 467. The Burns court went on to provide guidance to a trial court in its determination of when an instruction on a lesser-included offense is warranted:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. A trial court, thus, is not required to issue jury instructions on lesser-included offenses when there is no factual basis in the record in support of the lesser offense. Id. at 467.

In this case, conflicting testimony was offered by the victim and the defendant at trial. According to the victim, the defendant fondled and licked his penis. According to the defendant, the victim molested him by kissing and licking his chest, and he did nothing more than push the victim off his chest with his legs, raising him into an "airplane" ride, as he had done in the past. He unequivocally denied that he ever touched the victim's penis. A liberal view of the evidence, in the light most favorable to the lesser-included offense, fails to show any evidence to support a conviction of Class B misdemeanor assault, as opposed to aggravated sexual battery. As the State suggests, the evidence as presented at trial could have led to only one of two possible results: conviction on the charge of aggravated sexual battery, or an acquittal. Cf. State v. Howard, 926 S.W.2d 579, 586 (Tenn. Crim. App. 1996) (concluding that instruction on assault as lesser-included offense to aggravated sexual battery was warranted by defendant's testimony that he may have accidentally touched the victim's buttocks and thighs, distinguishing his case from those "'all or nothing' line of cases which do not require an instruction on a lesser included offense.") We conclude, therefore, that the trial court did not err in failing to instruct the jury on Class B misdemeanor assault.

## CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE