IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 13, 2002 Session

## RANDY CALDWELL & STEVIE W. CALDWELL v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for White County**
**No. 95-1F      Charles D. Haston, Sr., Judge**

_____

**No. M2001-00334-CCA-R3-PC** - Filed December 4, 2002

_____

The petitioners, brothers, were tried and convicted, jointly, of first degree murder, aggravated arson, and conspiracy to commit arson against personal property. They filed petitions for post-conviction relief, which the post-conviction court denied. After careful review, we affirm the decision of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Harvey Douglas Thomas, Algood, Tennessee, for the appellant, Randy W. Caldwell.

Cynthia F. Burnes, Nashville, Tennessee, for the appellant, Stevie W. Caldwell.

Michael E. Moore, Solicitor General; David H. Findley, Assistant Attorney General; William Edward Gibson, District Attorney General; and Benjamin W. Fann and Anthony J. Craighead, District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The petitioners, Stevie Caldwell and Randy Caldwell, were tried together and convicted by a jury of first degree murder, aggravated arson, and conspiracy to commit arson against personal property. Both were sentenced to life in prison for the first degree murder convictions, nineteen years for the aggravated arson convictions, and six months for the conspiracy to commit arson against personal property convictions, to be served concurrently. On direct appeal, this Court affirmed the petitioners' convictions and sentences. See State v. Caldwell, 977 S.W.2d 110 (Tenn. Crim. App. 1997).

On October 12, 1998, Randy Caldwell filed a petition for post-conviction relief, and on November 9, 1998, Stevie Caldwell also filed a petition for post-conviction relief. Thereafter, Stevie Caldwell filed two amended petitions for post-conviction relief. Following an evidentiary hearing, the trial court denied both petitioners' requests for relief. In this consolidated appeal from the trial court's denial of their petitions for post-conviction relief, the petitioners raise the following issues:

1. Whether the post-conviction court entered proper findings of fact to permit appellate review of the denial of Stevie Caldwell's post-conviction petition,
2. Whether the petitioners were denied their constitutional right to be present during jury selection,
3. Whether there was a conflict of interest affecting the district attorney and the assistants in the Thirteenth Judicial District regarding Randy Caldwell,
4. Whether the petitioners were afforded effective assistance of counsel regarding alibi witnesses, an alternate theory of the victim's death, production or discovery of additional exculpatory evidence, and the petitioners' alleged intoxication during the trial,
5. Whether Randy Caldwell's trial counsel was ineffective for failing to file a motion to suppress evidence, and
6. Whether Stevie Caldwell's post-conviction counsel was ineffective.

## I. Background

In the direct appeal of petitioners' convictions, this Court summarized the facts as follows:

Luther Gist, a resident of Gum Springs Mountain in White County, died in the early morning hours of December 8, 1994, after his home literally burned to the ground. The defendants, brothers Randy and Stevie Caldwell, along with their cousin, Lester Cunningham, were arrested in connection with the fire. Cunningham, who was sixteen years old at the time of the trial, decided to testify against his cousins in exchange for the charges being dropped against him.

Prior to trial, Cunningham, who was also known as "Boss" or "Boss Hog," had made several conflicting statements about his role and the role of the Caldwells in the death of the victim. When he was initially questioned by the police, Cunningham stated that on the night of the fire he had been at Randy Caldwell's house all night. Then, after extensive interrogation, Cunningham stated that he was with the Caldwells on the night of the fire and that Stevie Caldwell had burned the house. Cunningham's statement was captured on video tape and he retraced the entire evening on tape. The following January, however, Cunningham met with the defendants' attorneys and again said that he and the Caldwells had been fighting chickens on the night of the fire and that they did not leave the house. This statement was tape recorded, and the tape was played for the jury at the defendants' trial. On tape, Cunningham told the defense attorneys that his earlier statement in which he implicated the Caldwells had been a result of

-2-

pressure he received while being questioned by the police. He said the police told him what to say and he then repeated it on the tape.

At trial, Cunningham returned to the version in which he admitted that he and the Caldwells had been the ones to set the fire. He testified that on the evening of December 7, 1994, he and the Caldwell brothers were planning to fight chickens when they discovered they needed some tape in order to tape the spurs on the chickens. The three of them then went to Bain's Grocery to purchase the tape. Some time after 10:00 p.m., they returned to Randy Caldwell's house to fight the chickens. Lester Bain, owner of the grocery, confirmed that the three of them had come by his store shortly after 10:00 p.m. Upon returning to the house, the three began to fight the chickens. Cunningham testified that one chicken got away, leaving them unable to continue the fight. Cunningham further testified that they then decided to find another chicken. They decided to go to the victim's house because he was thought to have some chickens that belonged to the defendants. Cunningham testified that they had arrived at the victim's house around 11:15 p.m. According to Cunningham, Randy Caldwell parked his Oldsmobile Cutlass up the road from the victim's house rather than in his driveway. He testified that the reason for this was that the threesome was afraid the victim might shoot them for being at his house at such a late hour. Cunningham testified that he and the defendants had walked toward some hay bales in the victim's yard hoping to find some chickens. When they were unable to do so, Cunningham testified that they had then discussed burning some of the hay bales as a joke to scare the victim. He further testified that the defendants then decided to burn the house rather than the hay.

Cunningham testified that Randy Caldwell gave Stevie Caldwell some wadded up paper. Stevie Caldwell put some hay into the paper; then he and Cunningham waited while Randy Caldwell went back to his car to get a plastic jug which contained gasoline. Cunningham testified that after Stevie Caldwell poured gasoline on the bundle of hay and paper, Randy Caldwell returned to the car. Stevie Caldwell then approached the house with Cunningham right behind him. Stevie Caldwell then put the bundle in a window on the far end of the house and lit the bundle with a lighter he produced from his pocket. Cunningham testified that once they saw flames they ran back to the hay bales and ultimately back to the car. He further testified that the threesome then drove down the road and parked in a field so that they could see if the house caught on fire.

Cunningham testified that he and Stevie Caldwell then approached the house on foot so that they could get a better look at the flames. He testified that they were so close they could hear shotgun shells exploding. Randy Caldwell then left in his car and drove back down the mountain. Cunningham testified that he and Stevie Caldwell were then forced to feel their way down the mountain by going through a nearby wooded area. He testified that they would only go ten to twenty feet before stopping to rest. He estimated that it took them two to three

hours to get to the bottom of the mountain. He testified that while making the trek through the woods, Stevie Caldwell threatened to kill him if he said anything about the fire. Cunningham testified that when he and Stevie Caldwell reached the bottom of the mountain, they went to Linville Roberts' house in order to use her phone. He testified that they had told Roberts they had run out of gas and needed to call Randy Caldwell to come get them. Cunningham and Stevie Caldwell eventually returned to Randy Caldwell's house later that morning. The police found all three at Randy Caldwell's house and took them in for questioning.

The three were questioned separately, and Cunningham originally told the police that he did not know anything about the fire. He testified that prior to being separated from the defendants, they had told him not to say anything to the police. Thus, in his first statement to the police, he denied having any knowledge about the fire. However, Cunningham testified that when he learned that his punishment would be the same as the defendants' punishment, he decided to tell the truth because he "ain't done nothing to get that." He testified that at the time he admitted that he and the defendants had been the ones to set the fire, no promises had been made to him about the charges against him being dropped.

In January, the month after the fire, Cunningham gave a different statement to the defendants' attorneys. The statement was taken at the home of Linda Gail Caldwell, sister of the defendants, while Cunningham was on the run after escaping from the group home where he had been placed. In this statement, he again denied having any knowledge of the fire and said that he and the defendants had been at Randy Caldwell's house all night. At trial, Cunningham explained that most of this statement was a lie. He testified that he was told to say his "confession" had been "hassled out" of him. He said the defendants had thought that if they had been hassled at the jail, they "could get out of [the charges]."

In the months before the trial, Cunningham, who was in state custody, wrote letters and made phone calls to Sue Caldwell, mother of the defendants. In these letters, he expressed his desire to get the family together and how much he missed the family. In one letter, he again told the story that on the night of the fire, he and the defendants had stayed at Randy Caldwell's house all night to fight chickens. During the phone calls to Ms. Caldwell, Cunningham also said that he and the defendants had nothing to do with the fire. At trial, Cunningham testified that he had said and written those things at a time when he did not plan to testify against the defendants. Since that time, however, he determined that it was in his best interests to simply tell the truth. He testified that the version of events he told the jury was in fact the truth.

At trial, the State offered the testimony of several witnesses in order to corroborate Cunningham's story. Linville Roberts, the woman whose phone

Cunningham said he and Stevie Caldwell used on the morning of the fire, testified that the two came to her house around 3:00 a.m. She testified that she lived down the mountain from the victim's house. She further testified that by the way of the road, it would take only ten or fifteen minutes to walk from her house to the victim's house. Roberts testified that Stevie Caldwell had said something about being out of gas and that he had used her phone. She testified that Stevie Caldwell and Cunningham had left her house at about daylight. She said they simply walked away. Roberts also testified that the victim's house was more than seventy years old, that it had no running water, and that it was heated with wood.

Thomas K. Austin, chief of White County Rescue Squad, testified that he had seen the fire between 1:45 a.m. and 2:00 a.m. He testified that fire trucks arrived shortly thereafter, but that the house was already fully involved. He testified that the house literally burned to the ground, with only the chimney still intact. Austin further testified that the victim was found leaning against the base of the chimney in a sitting position; he was burned beyond recognition. The medical examiner's report revealed that the victim died of smoke inhalation.

Guy Goff, the chief criminal investigator for White County at that time, testified that he spoke with Stevie Caldwell the morning following the fire. He testified that Stevie Caldwell had told him that he heard about the fire from a relative and that he and Randy Caldwell went to see the fire around 3:30 a.m. However, Goff testified that other witnesses at the fire had seen Stevie around 6:00 a.m. rather than 3:30 a.m. Goff testified that he did not know whether Stevie Caldwell could tell time or not. Goff further testified that Stevie Caldwell said he had not run out of gas nor had he been walking anywhere lately. Goff also testified that a search of Randy Caldwell's car had revealed two plastic gallon jugs with a small portion of liquid which appeared to be flammable. A report from the TBI Crime Unit revealed that the jugs contained an accelerant in the kerosene range such as kerosene, fuel oil number one, some brands of charcoal starter, and some aviation fuel. Terry Hembree, a criminal investigator with the district attorney's office, testified that he had searched Stevie Caldwell the morning after the fire and found a pink cigarette lighter in his pocket, but he found no cigarettes.

Edward Bain, who lived about a mile from the victim, testified that in the early morning of December 8, he heard a car driving very fast down the mountain. He testified that around 1:50 a.m., a car with what sounded like a loud muffler came down from the dead end road. He did not actually see the car. Norman Roberts, who also lived near the victim, also testified that he heard a loud car at about 2:15 am. He testified that it sounded like a car with a glasspack muffler. He also testified that he had heard Randy Caldwell's car earlier that day and that the car that passed at 2:15 a.m. sounded like Randy Caldwell's car. However, Roberts did not actually see the car.

James Kenneth Robinson, a supervisor with White County Central Maintenance, testified that he had examined Randy Caldwell's car and determined that it had a glasspack or cherry bomb muffler. He further testified that such a muffler would make a distinctive, loud roaring or popping sound. However, he testified that he did not actually start Randy Caldwell's car and listen to its muffler. He also noted that the exhaust system on Randy Caldwell's car is fairly common.

The defendants offered no proof.

State v. Caldwell, 977 S.W.2d 110, 113-15 (Tenn. Crim. App. 1997).

## II. Post-Conviction Hearing

Hilton Conger, trial counsel for Stevie Caldwell, and Chris Cantrell, trial counsel for Randy Caldwell, both testified at the post-conviction hearing. Stevie's attorney testified that he and Randy's attorney worked together on the petitioners' defense. He has been practicing law since 1972 and approximately half of his practice is criminal defense work. Prior to trial, Stevie's attorney conferred with both petitioners, petitioners' family, and Randy's attorney on numerous occasions. According to Stevie's attorney, they investigated the case by interviewing witnesses identified by the petitioners and the State, but did not conduct an independent investigation to discover other witnesses. Stevie's attorney did not recall interviewing Kelcy Butler, Timmy Young, Debbie Young, or Eugene Mitchell, and had no independent recollection of being informed prior to trial that they were potential witnesses. Stevie's attorney did recall interviewing the wives, parents, and cousin of both petitioners. He also recalled interviewing Linville Roberts, a witness for the State, but vaguely recalled hearing the name Timmy Dildine. He believed that he and Randy's attorney had been unable to verify Dildine's statement.

According to Stevie's attorney, the focus of their defense was that the boys had an alibi and that Lester Cunningham was not credible. To that end, the two defense attorneys audio-taped an interview of Cunningham during which Cunningham recanted his statement to police and claimed that he was actually at home with the petitioners at the time of the fire. They also conducted a mock trial with all of the intended alibi witnesses, which included the wives and parents. However, the defense attorneys did not put on any proof at the actual trial. The decision not to put on any proof was based on both attorneys' opinion that Cunningham, the key witness for the State, had been successfully impeached.

Stevie's attorney opined that, if the jury believed Cunningham after he had been impeached with numerous prior inconsistent statements, there was nothing that any other witness could say that would change the jury's mind. In addition, both Randy and Stevie Caldwell were adamantly opposed to testifying. Stevie's attorney acknowledged that all of the alibi witnesses were believable, yet, none of them would have been very good witnesses. He also recalled that some of the witnesses could not establish an alibi for the time when the fire actually occurred. Specifically, he believed that the petitioner's father could only account for the boys' whereabouts at 10:00 p.m.

With respect to the allegation that the petitioners were not present during voir dire, Stevie's attorney testified that the petitioners were either in the courtroom or with either attorney at all times during the trial. He also testified that there was no indication to him that Stevie Caldwell was under the influence of alcohol or medication during the trial, but added that it was a very long trial.

Chris Cantrell testified that he represented Randy Caldwell at trial and agreed both defense attorneys worked together. He stated that he spent at least half of his time practicing criminal defense. Stevie's attorney did not recall Kelcy Butler, Eugene Mitchell or Debbie Young. He recalled that there was a Timmy, but could not remember if it was Young or Dildine. He did remember that whoever it was did not mention anything about a bad relationship between the victim and Wayne Cunningham. Both attorneys agreed that they spoke at length with the petitioners' wives, parents, and sister on numerous occasions in preparation for the trial. After the mock trial with the potential alibi witnesses, Randy's attorney testified that there appeared to be three witnesses that could have been useful to the defense: Junior Caldwell, Bridgett Caldwell, and Gayle Caldwell. Junior Caldwell, the petitioners' father, could testify to the petitioners' activities earlier in the night, placing the petitioners home about an hour before the fire. Bridgett and Gayle, the petitioners' wives, could testify that they were in bed with them all night. However, Randy's attorney opined that even though neither was a very good witness, Bridgett was the better of the two. He explained that both were credible and believable, but Gayle was easily confused and had difficulty keeping times straight. He also recalled that, prior to trial, it appeared possible, if not likely, that Lester Cunningham, the State's key witness, would be testifying for the defense based on the statements he made as the trial neared. However, they were prepared to impeach his testimony should he decide to testify for the State.

After the close of the State's proof, both attorneys felt that the case had gone as well for the defense and as bad for the State as they could have imagined. They recalled that both petitioners were adamantly opposed to taking the stand and that the only decision was whether or not to present the wives' testimony. The consensus of both attorneys was not to put on any witnesses.

Bridgett Caldwell, Stevie Caldwell's ex-wife, testified that she and Stevie were living with Randy and Gayle Caldwell at the time of the victim's death. She recalled participating in a mock trial with the petitioners' trial attorneys prior to the trial. At the mock trial, Bridgett verified that the petitioners and Lester Cunningham were home all night, except for a fifteen-minute period of time. During their fifteen-minute absence, the three men reportedly went to the grocery store to purchase tape. In addition, Bridgett stated that the family learned about the fire at 6:00 a.m. when the petitioners' sister, Linda Caldwell, telephoned their home to tell them about it. At the post-conviction hearing, Bridgett testified that she was prepared to testify at trial to the aforementioned, but was never called by the defense attorneys.

Bridgett acknowledged that she divorced Stevie Caldwell after he was convicted of the instant crimes. She indicated that she was currently dating and planned to marry Timmy Dildine. Bridgett admitted that she knew that Dildine was also planning to testify for the petitioners at the hearing. She did not know if Dildine and Stevie Caldwell got along, but

admitted that Stevie Caldwell had confronted her about Timmy Dildine allegedly spanking his and Bridgett's child. She also admitted that she told the district attorney's office a different story than the aforementioned version she related to the defense attorneys. According to Bridgett, the petitioners were not really at home on the night of the fire, and she only agreed to testify that they were because the family put pressure on her. However, since her divorce from Stevie, she felt no pressure to continue lying about what had happened. Bridgett admitted that, prior to the post-conviction hearing, she spoke with the petitioners' post-conviction counsel over the telephone and related the same version to him that she had given at the mock trial. She explained that she did not want the petitioners to know what was going on, so she gave differing versions to the State and defense.

According to Bridgett, the true story is that both petitioners and Lester Cunningham left their home at dark, and Cunningham grabbed a gun before he left. Later, Bridgett received a telephone call from the petitioners' mother, who informed Bridgett that she heard about the fire on her police scanner. Although Bridgett was unable to remember the exact time, she claimed that Stevie called her later that morning from Linville Roberts' house. She spoke with both Stevie and Linville on the telephone. According to Bridgett, when Stevie returned home around 5:00 or 6:00 a.m., he told her they had accidently burned the victim's house down.

Eugene Mitchell, Randy Caldwell's father-in-law, testified at the post-conviction hearing that he also spent the night at the petitioners' home on the night of the fire. He explained that he frequently stayed there when he visited his daughter. Although he was not questioned prior to trial by either of the petitioners' trial counsel, Mr. Mitchell would have testified at trial had he been called as a witness. According to Mr. Mitchell, the substance of his testimony would have been that the petitioners were at home all night that night, except for ten minutes. The petitioners fought chickens at their residence until midnight, only leaving to go to the store for ten minutes between 9:00 and 10:00 p.m. In addition, Mr. Mitchell claimed that he ran out of gasoline two or three weeks prior to the fire, and Randy Caldwell brought him three jugs of gasoline to put in his van. Mr. Mitchell returned the empty jugs to Randy on the night of the fire. He placed two of them in the trunk of Randy's car and set one beside the house in the yard. On cross-examination, he admitted that his van has a gasoline engine and, to his knowledge, does not run on kerosene.[1] The State requested that Mr. Mitchell's testimony be disregarded pursuant to the "physical fact" rule, which applies to testimony that is irreconcilable with physical evidence.[2]

Gayle Caldwell, Randy Caldwell's wife, testified that she and Randy were at their home on the night of the fire. Stevie and Bridgett Caldwell, Lester Cunningham, and Eugene Mitchell were also there. At some point, the petitioners and Cunningham went to Bain's Store to buy

---

[1] At trial, it was revealed that the jugs found in the trunk of Randy's car contained a small portion of liquid, which was found to be an accelerant in the kerosene range such as kerosene, fuel oil number one, some brands of charcoal starter, and some aviation fuel.

[2] In our view, the testimony of Mr. Mitchell can be reconciled with the physical evidence. For example, if the jugs contained kerosene at some point and were later used for gasoline, a small portion of kerosene could be present in the bottom of the jug.

-8-

tape. After they returned from the store, Randy, Stevie, and Cunningham stayed at the Caldwells' residence the rest of the night. According to Gayle, the three of them came inside around midnight after fighting chickens in the yard. Everyone watched "Family Matters" on television until 12:30 a.m. and then went to bed. Gayle's husband, Randy, went to bed with her and their infant son, and Stevie went into the bedroom with his wife, Bridgett. Cunningham slept in the living room. Around 2:00 a.m., Junior Caldwell and Junior Emerton woke Gayle and Randy by knocking on their bedroom window. Randy let them in the house, and they asked if anyone had seen their coon dogs. They left after five or ten minutes, and Gayle and Randy returned to bed. Gayle did not actually see Cunningham or Stevie at 2:00 a.m., but believed that Stevie also got out of bed while his father and Junior Emerton were there.

Around 6:00 a.m., the petitioners' sister called and informed them that there had been a fire at the victim's home. Gayle recalled that the petitioners, Cunningham, Bridgett, and Gayle's father were all present at that time. A few days after the fire, Gayle was in the car with Stevie Caldwell when Wayne Cunningham, Lester Cunningham's father, blocked the road with his car. According to Gayle, Wayne told Stevie that he would kill him if he said anything about the victim. Gayle attended the petitioners' jury trial and was prepared to testify as an alibi witness. She recalled being present after the State closed its proof and claimed that the trial attorneys made the decision not to call any witnesses. On cross-examination, Gayle admitted that she did not see Stevie or Cunningham after they went to bed around 12:30 a.m. until after 6:00 a.m. the next morning. However, she did see Randy, who was in bed with her. Gayle also testified that Randy's car did not make a louder noise than any other car.

William "Junior" Caldwell, the petitioners' father, testified that he was at the petitioners' home around 10:00 p.m. on the night of the fire. He recalled the time because the petitioners were fighting chickens and asked him for tape to tape the chickens' spurs. He advised them that Bain's store might still be open. He and his hunting partner, Junior Emerton, continued to look for their coon dogs and stopped back at the petitioners' home at 2:10 a.m. Junior Caldwell noticed the exact time on the bedroom wall clock after Junior Emerton told him that he needed to go home because he had to go to work later that morning. Junior Caldwell testified that he knocked on Randy's bedroom window and then entered the house through the back door to the bedroom. He observed Randy, Gayle, and their baby in the bedroom. He also indicated that Stevie and Bridgett were in their room, and he believed that Cunningham and Eugene Mitchell were in the living room. Although he was not certain, he believed that Mr. Mitchell got up to go to the bathroom while he was there.

Junior Caldwell was present during a meeting with the trial attorneys after the State closed its proof. He recalled that Stevie's attorney said, "They ain't laid a glove on us yet, boys. You ain't got nothing to worry about." Junior indicated that he wanted to testify and told the attorneys they were wrong for not calling any witnesses. According to Junior, Gayle Caldwell would be wrong if she testified that no one said anything when the attorneys decided not to put on proof.

Sue Caldwell, the petitioners' mother, testified that she recalled the day following the fire because police investigators came to her house and inquired about Stevie. She informed them

-9-

that Stevie was at Randy's house. Thereafter, one of the investigators drove Stevie, and the other investigator drove Lester Cunningham to the police station. Randy drove his car to his mother's house, and she rode with him to the police station. According to Ms. Caldwell, one of the men, Mr. Goff, informed her that she could not drive Randy's car home and refused to assist her in finding a ride home. Therefore, she got her ex-husband to assist her in getting her truck from her home. When she returned to the jail, she observed police officers searching Randy's car. Ms. Caldwell did not speak to either of her sons at the jail but did speak with Lester Cunningham, her nephew. She testified that she gave Cunningham a pink lighter and three cigarettes. However, upon further questioning, she explained that she was not allowed to hand Cunningham the items personally. Instead, she handed them to the jail administrator, Rooster, who, in turn, was to hand them to Cunningham. Cunningham was in the holding room at the time, and she did not personally observe Rooster place the lighter and cigarettes into Cunningham's hand. On cross-examination, Ms. Caldwell admitted that her affidavit stated that Cunningham gave Stevie one of the cigarettes and the lighter but that she did not have personal knowledge of that assertion.

Ms. Caldwell also related a conversation she had with the victim a week before his death. She claimed that she and Junior Caldwell saw the victim while looking for one of Junior's coon dogs. The victim told the Caldwells that Linville Roberts, a State witness at trial, had recently told the victim that he should be "tarred and feathered and run off the mountain." Ms. Caldwell denied any knowledge of her brother, Wayne Cunningham, owing the victim money. On cross-examination, Ms. Caldwell admitted there was a typographical error in her affidavit, which reflected that, in August of 1995, the victim told her that her brother owed him $1,700.00. The victim died in December of 1994.

Ms. Caldwell was present with the rest of the family at a meeting after the close of the State's proof. One of the trial attorneys said, "They ain't laid a glove on us yet. There is no need in me putting nobody on the witness stand." Ms. Caldwell claimed that she was very upset about it and asked the attorneys, "Why not?"

Timmy Dildine testified that he also lives on Gum Springs Mountain. The day of the victim's death, he overheard a conversation between the victim and Wayne Cunningham, which took place at a grocery store on the mountain. According to Dildine, the victim told Wayne that he wanted his money or he would blow Wayne's head off, and Wayne responded that he would get the money as soon as he could. Thereafter, the victim agreed to give Wayne a few more days. Dildine testified that he related this information to both Randy and Stevie's trial counsel prior to trial. He claimed that Randy's attorney wrote down his statement, and he signed it. Dildine also asserted that he was present for the mock trial and was surprised when he was not called as a witness at the jury trial. He acknowledged that although he was presently incarcerated for theft, he did not have a criminal record at the time of petitioners' jury trial. Although Dildine is presently engaged to Bridgett Caldwell, Stevie's former wife, he denied any hard feelings between him and Stevie.

On cross-examination, Dildine acknowledged that he gave the affidavit in 1998, three years after the murder. He did not know who typed it but admitted that Stevie and Randy were

"kind-of telling him about [what to say]." Dildine further admitted that presently, five years after the murder, he could not remember whether anything in his affidavit was actually said or not.

Timmy Young testified that he lived on Gum Springs Mountain and was best friends with Randy Caldwell when he was growing up. According to Mr. Young, the victim pulled a pistol out and told Wayne Cunningham he was going to shoot him if Wayne did not pay back the money he owed the victim. The next day, Wayne placed a pistol on top of his car and said that he would kill the victim before the victim could kill him. Mr. Young recalled that both incidents took place at the home of Young's mother. He could not recall the exact date of the incidents but estimated that it was two or three weeks before the victim's death. Mr. Young claimed that, prior to trial, he informed Randy's attorney about these incidents. Specifically, he testified that Randy's mom drove him to the attorney's office in Smithville.

June Swindell, the court officer at the time of the petitioners' jury trial, testified that she was charged with isolating Lester Cunnningham from everyone else during the trial. However, Ms. Swindell observed Cunningham yelling out the window to his father, Wayne. She also heard his father yell back something to the effect of "don't tell," or "you shouldn't tell." Thereafter, she removed Cunningham from the window where he was sitting. On cross-examination, Ms. Swindell testified that she did not believe that Wayne could have said "tell the truth." When asked if Wayne could have said "don't tell any lies," Ms. Swindell responded, "Well, he could have."

Linda Gail Young, the petitioners' sister, testified that she was present when her mother purchased a pink cigarette lighter and a carton of cigarettes at Uncle Pete's store in Lebanon. Ms. Young did not have personal knowledge of what her mother did with the lighter. Ms. Young was present at the petitioners' jury trial and was listed as a potential witness. After the State closed its proof, Ms. Young remained out in the hall with Timmy Dildine while the rest of the family discussed the case in a closed room.

Olla June Young testified that she lived on Gum Springs Mountain on the night of the fire. Her home was the first house on the road where the victim lived, and all traffic to the victim's home would have passed in front of her home. Ms. Young testified that she was at home on the day of the fire and either saw or heard several of the people who lived on the road drive past her home. Ms. Young testified that she was familiar with the sound of Randy's car at that time. She neither saw nor heard the car pass her home on the night of the fire. Although she was sleeping after midnight that night, she claimed that the car would have awakened her had it gone past her home. Ms. Young was never interviewed by the petitioners' trial counsel. However, she was present in the courtroom on the second day of the trial to support her sister, the petitioners' mother.

Stevie Caldwell testified that his trial counsel was Hilton Conger. He originally went with his mother and brother to the office of Chris Cantrell, Randy's attorney. However, Randy's attorney advised them that he could not represent both petitioners. Based on his recommendation, Stevie retained Conger, and Randy retained Cantrell to represent them at trial.

Thereafter, Stevie met with his own attorney on several occasions. Stevie specifically recalled providing his attorney with Timmy Dildine's name as a potential witness. He also claimed he told his attorney that Eugene Mitchell was at their house on the night of the fire, and his attorney stated that he would be talking to the witnesses at a later date. Randy's attorney also informed Stevie that the district attorney's office had no evidence to prove that a crime was committed but that they wanted to convict Stevie of something. Therefore, the district attorney's office had offered a deal for Stevie to plead guilty to fighting chickens in exchange for the dismissal of all other charges. According to Stevie, he refused the deal because "they did not catch [him] fighting chickens."

Stevie testified that, prior to trial, his trial counsel only interviewed two State witnesses, Linville Roberts and Lester Cunningham. He further alleged that he was not present during jury selection. According to Stevie, he was never notified that the jury was being selected. Later, he asked his trial counsel why he did not get to "pick half the jury." His trial counsel allegedly replied, "We picked the judge, the District Attorney's office picked the jury." After the State closed its proof, the two petitioners and their family met with their attorneys. Stevie's attorney told them that the State "ain't laid a glove on us; it is just like rolling the dice." He further advised them that it was up to the judge and the jury to believe or disbelieve their witnesses. When asked if he would testify, Stevie replied that he would. However, Randy answered that he would rather not testify because he was nervous, but would testify if the attorneys thought he should. Finally, Stevie's attorney asked what they wanted to do, adding "it is like rolling the dice." Stevie replied, "Well, let's roll with it and see what happens." He explained that he meant "let's put on our witnesses and see what happens."

When the petitioners returned to the courtroom, the attorneys made an argument and sat back down. According to Stevie, his attorney informed him that it was over and that the jury had found him guilty. At this point, he was still expecting his attorney to put on proof. He began poking his attorney and trying to get him to get back up. His attorney told him to "sit down and shut up."

Stevie also testified that on the first day of the trial, he and Randy drank half a pint of liquor during the lunch break. They got the liquor from their sister, who had it in her van. Later, Randy's trial counsel asked the petitioners' mother if she had anything to give the petitioners for their nerves. His mother responded that she had a bottle of Valium and handed it to Randy's attorney. Apparently, Randy, in particular, was extremely nervous during the trial. According to Stevie, Randy's attorney dispensed the Valium to them during the trial. They each took about five pills. Stevie claimed that, as a result of the alcohol and Valium, he was unable to keep up with what was going on during the first day of the jury trial. Stevie also maintained that his trial counsel should have requested a mental evaluation of him prior to trial, because his counsel was aware that Stevie was on social security disability for a mental defect.

On cross-examination, Stevie acknowledged that he had been to five psychiatrists, which eventually led to his disability status. He further acknowledged that he could not read or write and had difficulty telling time. With respect to the testimony of Bridgett, his ex-wife, Stevie claimed that she was lying when she testified that he was not home on the night of the fire and

that he had called from Linville Roberts house and told her that he, Randy, and Cunningham had accidently burned down the victim's house. He admitted that he previously told police that he went to investigate the fire at 3:30 a.m., but he maintained that he could not "tell good time" and that it was actually around 6:00. a.m. According to Stevie, there were still fire trucks and rescue personnel blocking the road at that time. However, a review of the trial transcript reveals that a neighbor testified that the fire trucks left around 5:00 a.m. When asked how he knew the victim had been killed in the fire, Stevie claimed that his sister heard it on the police scanner and related it to him.

Randy Caldwell testified that his reading and writing abilities were fair, but acknowledged that he was also on social security disability for a mental defect. Specifically, he asserted that he was "off in the head." As a result, Randy was very nervous during the trial and did not want to testify. He testified that his mother made the decision to hire Randy's attorney as his trial counsel and that she paid the legal fees.

Upon meeting Randy's attorney at the jail, Randy told him that he was not guilty and provided Cantrell with the names of alibi witnesses. Eugene Mitchell and Junior Emerton were among those he named. Later, Randy told his attorney that Timmy Young and Debbie Young might be useful witnesses. According to Randy, his attorney informed him that he intended to present the testimony of his wife Gayle, Stevie's wife Bridgett, and the petitioners' parents, Stevie and Eugene. He met with his attorney on several occasions prior to the jury trial. Randy reiterated Stevie's testimony that both attorneys told them that the district attorney got to pick the jury and the defense got to pick the judge. Randy was also under the impression that, based on the most recent communications from Cunningham, Lester Cunningham would be testifying for the defense at trial. However, Randy was aware that both attorneys were prepared to impeach Cunningham with his prior inconsistent statement if he testified for the State. Randy believed that his attorney was also planning to put on alibi witnesses and did not realize that he was not going to call any witnesses, until his attorney announced it to the court. According to Randy, he never assented to the decision not put on a defense, but did make the decision not to personally testify.

Randy also alleged he was intoxicated after lunch on the first day of the jury trial. However, Randy corrected Stevie's testimony that they split a half-pint of liquor, claiming that it was actually a pint of liquor. Although he never specifically told his trial counsel that he had consumed liquor at lunch, Randy believed that his attorney must have smelled it on his breath. Randy also claimed that his attorney asked him how he felt at every break in the trial. When Randy responded that he was nervous, his attorney would give him Valium. The Valium were ten milligrams each, and Randy took five after lunch and then a couple more at each break during the trial. As a result of taking the Valium, Randy "just sat over there minding [his] own business; didn't know nothing that was going on in the court; didn't really care." At the conclusion of the trial, Randy believed the trial judge told him he could go home with his wife, when he actually sentenced him to life in prison.

Randy's attorney never informed the trial judge that the petitioners were on medication or asked Randy whether he was aware of what was going on at trial. However, after learning

-13-

that the petitioners both received social security disability checks for mental defects, the District Attorney asked Randy if he knew the difference between right and wrong. Randy responded that he did, and the District Attorney said, "That is good enough for me."

On cross-examination, Randy claimed that he did not know that he was on trial for murder, but believed that he was actually being tried for fighting chickens because that was the plea he was offered. He admitted that he made the decision not to testify because he was nervous, but maintained that he never agreed not to put on any alibi witnesses.

### III. Analysis

In order to obtain post-conviction relief, a petitioner must allege that his conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-203 (1997). If granted an evidentiary hearing, the petitioner has the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-210(f). Findings of fact and conclusions of law made by the post-conviction court are afforded the weight of a jury verdict and may not be re-weighed or re-evaluated by this Court. Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Consequently, this Court is bound by those findings unless the evidence contained in the record preponderates otherwise. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

A petitioner, alleging ineffective assistance of counsel, must prove the allegations of fact underlying his claim by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997); Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). In order to determine whether counsel provided effective assistance, this Court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). When reviewing a defense attorney's actions, this Court may not use "20-20" hindsight to second-guess counsel's decisions regarding trial strategy and tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

To succeed on a claim that his trial counsel was ineffective at trial, a petitioner bears the burden of showing that his counsel made errors so serious that he was not functioning as counsel, as guaranteed by the Sixth Amendment, and that the deficient representation prejudiced the petitioner, resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the second prong, the petitioner must show that he was prejudiced by his counsel's unprofessional errors such that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have differed. Strickland, 466 U.S. at 694. Petitioner's failure to prove either element, deficient performance or prejudice, requires dismissal of his claim. Id. at 697.

### I. Trial Court's Findings of Fact

The petitioner, Stevie Caldwell, alleges the post-conviction trial court failed to make sufficient findings of fact and conclusions of law to permit proper review. The trial court is

required to set forth written findings of fact and conclusions of law for each claim raised in a post-conviction petition. Tenn. Code Ann. § 40-30-211(b). Although this requirement is mandatory, reversal is not always warranted when a trial judge fails to include written findings of fact and conclusions of law in the order dismissing a post-conviction petition. State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984). The legislative intent of the statute is to aid the appellate court's review of post-conviction proceedings. Id.; George v. State, 533 S.W.2d 322, 326 (Tenn. Crim. App. 1975). A post-conviction court's failure to address specific findings as to each issue raised by petitioner does not necessarily preclude meaningful review. See Rickman v. State, 972 S.W.2d 687, 692 (Tenn. Crim. App. 1997).

The post-conviction court, in lieu of written findings, made oral findings of fact and conclusions of law that were duly transcribed in the record. A fair reading of the judge's findings strongly infers that the testimony of the trial attorneys was accredited. The petitioners complain that the post-conviction judge failed to address all issues in the oral or written order. Arguably, this is true; however, in his conclusion, the judge specifically asked both post-conviction counsel if there were other issues he had not addressed. Both responded negatively. Additionally, the petitioner's appellate brief fails to specifically identify the issues allegedly omitted, thus inviting speculation as to the issues we should review. For the reasons cited, we hold this issue is without merit.

## II. Jury Selection

We next address the petitioners' allegations that they were not present for jury selection. This was directly contradicted by Stevie Caldwell's attorney, Mr. Conger. Randy Caldwell's attorney agreed with Mr. Conger's testimony. Having previously concluded that the post-conviction judge accredited the trial attorneys' testimony, we dismiss this issue.

## III. Disqualification of District Attorney

The next issue raised by the petitioner, Randy Caldwell, is whether the trial court abused its discretion by denying the motion to disqualify the District Attorney General and his staff. In determining whether to disqualify a prosecutor in a criminal case, the trial court must determine whether there is an actual conflict of interest, which includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of "compromising interests and loyalties." See Tenn. R. Sup. Ct. 8, EC 5-1. If there is no actual conflict of interest, the court must nonetheless consider whether conduct has created an appearance of impropriety. See Tenn. R. Sup. Ct. 8, EC 9-1, 9-6.

If disqualification is required under either theory, the trial court must also determine whether the conflict of interest or appearance of impropriety requires disqualification of the entire District Attorney General's office. See State v. Tate, 925 S.W.2d 548, 550 (Tenn. Crim. App. 1995). The determination of whether to disqualify the office of the District Attorney General in a criminal case rests within the discretion of the trial court. Appellate review of such a ruling is limited to whether the trial court has abused its discretion. See id. at 50; State v. Culbreath, 30 S.W.3d 309, 312 (Tenn. 2000).

On the morning of the post-conviction evidentiary hearing, a motion was presented to disqualify the District Attorney General and staff due to a federal civil suit filed by petitioners naming the General and his staff as defendants. The civil action had been dismissed prior to the post-conviction hearing. Petitioners' counsel alleged that the action could potentially be reinstituted, raising the specter of a conflict of interest. The post-conviction judge declined to grant the petitioners' motion on this mere speculative possibility. No evidence is filed in the technical record showing the nature of the civil complaint. Furthermore, the petitioners cite no authority in support of their position. We conclude this issue is without merit.

## IV. Ineffective Post-Conviction Counsel

The petitioner, Stevie Caldwell, next argues that his post-conviction attorney was ineffective. Specifically, the petitioner alleges that not all claims alleged in the original and amended petitions were developed at the post-conviction hearing. The post-conviction process is governed by the Post-Conviction Procedure Act of 1995. See Tenn. Code Ann. §§ 40-30-201-222; Leslie v. State, 36 S.W.3d 34, 36 (Tenn. 2000). There is no constitutional right to representation by counsel in post-conviction proceedings and, thus, no right to effective assistance of counsel in post-conviction proceedings. House v. State, 911 S.W.2d 705, 712 (Tenn. 1995). However, there is a statutory right to counsel. See Tenn. Code Ann. § 40-30-207(b)(1). "The appointment of counsel assists in ensuring that a petitioner asserts all available grounds for relief and fully and fairly litigates these grounds in a single post-conviction proceeding." Leslie, 36 S.W.3d at 38.

Tenn. Sup. Ct. R. 28 was adopted by our supreme court on October 28, 1996, and provides comprehensive requirements for the handling of post-conviction petitions. The following is required of counsel:

> Appointed or retained counsel shall be required to review the pro se petition, file an amended petition asserting other claims which petitioner arguably has or a written notice that no amended petition will be filed, interview relevant witnesses, including petitioner and prior counsel, and diligently investigate and present all reasonable claims.

Tenn. Sup. Ct. R. 28, § 6(C)(2). Counsel is also required to file a certification indicating that he or she has "thoroughly investigated the possible constitutional violations," has discussed the possible constitutional violations with the petitioner, and has raised all non-frivolous constitutional grounds warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law. Tenn. Sup. Ct. R. 28, § 6(C)(3) and App. C.

These standards strike the proper balance between counsel and the petitioner in determining the course and conduct of post-conviction proceedings. Leslie, 36 S.W.3d at 38. Counsel must consult with the petitioner when feasible, but counsel retains the discretion to make tactical decisions as to which issues to pursue. Id.

The petitioner herein cites no case law as authority in support of this issue. He contends that a conflict existed between the clients and their post-conviction counsel, as evidenced by the

-16-

pro se motion to excuse counsel. The petitioner concedes there is no constitutional right to effective counsel in a post-conviction proceeding, House, 911 S.W.2d at 712, but maintains a "manifest injustice" results under these circumstances. We are bound by the constraints of statutory and case law authority previously cited and, accordingly, conclude that this issue is without merit.

## V. Ineffective Trial Counsel

The last issue concerns an allegation of ineffective assistance of trial counsel. Specifically, the two petitioners present jointly and/or separately the following alleged derelictions of trial counsel:

I. failure to produced promised alibi witnesses;
II. failure to utilize an alternative theory as to cause of death;
III. failure to do an independent investigation;
IV. allowing trial to proceed when the petitioners were impaired by drugs and/or alcohol;
V. failure to produce additional evidence beneficial to the defense; and,
VI. failure to file a suppression motion concerning evidence seized from the petitioners.

## A. Promised Alibi

In the opening statement, trial counsel stated that they expected the proof to show the petitioners were at home in bed with their wives during the night in question. No witnesses were called by the trial defense team.

The putative alibi witnesses were: Bridgett Caldwell (wife of Stevie Caldwell), Gayle Caldwell (wife of Randy Caldwell), William Caldwell (father of petitioners), Eugene Mitchell, and Junior Emerton. At the post-conviction hearing, Bridgett Caldwell said she would have testified at trial that the petitioners were at home on the night of the offense. She further said this would have been perjured testimony, given due to pressure from Caldwell family members.

Gayle Caldwell, wife of Randy Caldwell, testified at the post-conviction hearing that both petitioners were at home on the night of the offense except for a brief time when they went to a store. She admitted that after midnight, she only saw Randy Caldwell at about 2:00 a.m. and did not see Stevie Caldwell until the next morning. This testimony would not have been inconsistent with that State's theory as to the sequence of events.

William Caldwell, father of petitioners, stated in his post-conviction testimony that both petitioners were at their home at 10:00 p.m. and 1:50 a.m. on the night of the offense.

Junior Emerton's affidavit, introduced at the post-conviction hearing, stated he was with William Caldwell on the night of the offense and saw Randy Caldwell at 2:00 a.m. The affidavit is brief and neither fully supports nor disputes other testimony of William Caldwell. Likewise, Emerton's affidavit would not conflict with the State's theory of events.

-17-

Eugene Mitchell, Randy Caldwell's father-in-law, testified at the post-conviction hearing that he spent the night at the petitioners' house on the night in question. He stated both petitioners were home all night, except for a brief period when they made a trip to a store. Mitchell was not interviewed by trial defense counsel. Stevie Caldwell's trial counsel did state that all names furnished by their clients as potential witnesses were interviewed.

A mock trial was conducted by trial defense counsel. All the proposed alibi witnesses, with the exception of Mitchell, were evaluated. Both attorneys had misgivings about the wives' capability as witnesses, although they did not question their credibility. As to William Caldwell, the trial attorneys doubted his testimony actually provided an alibi as to the significant times.

A failure by trial defense counsel to present proof that was promised in opening statements may have such an adverse effect on the trial as to require reversal of the conviction. State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). The trial transcript was not made an exhibit at the post-conviction proceeding, but we will review our record from the direct appeal. State v. Townes, 56 S.W.3d 30, 34 (Tenn. Crim. App. 2000). At trial, the State presented Guy Goff, the Chief Criminal Investigator for White County Sheriff's Department. Goff went to the petitioners' residence on December 8, 1994, the day of the offense, and separately interviewed the petitioners, Lester Cunningham (their accomplice) and the petitioners' wives. The following exchange with Goff occurred on cross-examination by Stevie Caldwell's counsel:

> Question: Okay. So when you got there and you got everybody separated and talked to them in separate rooms and so forth, the consistent story, the theme that ran through the testimony or the statements that you got from Stevie; from Bridgett; from Randy; from Gail, Randy's wife; and from Boss was that they had fought chickens there, all night, or fought chickens there up until the early morning hours, twelve or so. Right?
> Answer: Correct.
> Question: And that they went to bed and slept there until a relative called about six o'clock in the morning and told them that Luther Gist's house had been burned down?
> Answer: I don't, let's see, I don't recall if it was exactly six o'clock or not, but that's, the rest of that's correct.

During closing argument, trial counsel for Stevie Caldwell was able to argue, without objection, as follows: "We certainly could have called witnesses up here to testify where those boys were that night. Their wives would have testified that they were home with them."

During the mock trial, trial counsel had the opportunity to assess the proposed alibi witnesses. Both counsel had obvious misgivings concerning the proposed alibi witnesses. As the proof developed, counsel were able to put the wives' statements of alibi into evidence through the Sheriff's chief investigator, Mr. Goff. Even in the luminescence of hindsight, we

cannot conclude that trial counsel's course of action and tactical choices, as to the alibi witnesses, fell below the competence demanded of attorneys in criminal cases.

## B. Alternative Theory

The petitioners next allege that trial counsel were ineffective due to their failure to develop an alternative theory of other individuals with a motive to kill the victim. To support this charge, reliance is made upon three witnesses: Sue Caldwell, Tim Dildine, and Tim Young.

Sue Caldwell, mother of the petitioners, related a conversation with Luther Gist, the victim, wherein Gist said, "Linville Roberts told him he ought to be tarred and feathered and run off the mountain." Linville Roberts' testimony at trial was that the victim was the "nicest person."

Timothy Dildine testified to overhearing a conversation between the victim and Wayne Cunningham, father of the petitioners' accomplice, Lester Cunningham. The victim threatened to kill Wayne Cunningham if the victim was not repaid certain money owed him. Dildine equivocated on cross-examination as to the death threat and admitted that the petitioners told him what to say.

Tim Young claimed to have told both trial defense attorneys of death threats by the victim against Wayne Cunningham and Cunningham's vow to "get Luther [the victim] first." Stevie's attorney stated that he was unable to verify Dildine's allegations. Furthermore, he did not recall Tim Young, but stated that the petitioners were urged to locate Wayne Cunningham for verification, but this was not accomplished. Randy's attorney could only remember interviewing a "Timmy," but counsel denied ever hearing of a hostile relationship between the victim and Wayne Cunningham.

The petitioners place great reliance on State v. Burns, 6 S.W.3d 453 (Tenn. 1999), for the proposition that trial counsel was ineffective for failing to pursue an alternative theory of the victim's death or motive to kill the victim. In Burns, trial counsel was adjudged deficient for failure to investigate an alternative theory when the State only had one witness implicating the defendant, and corroboration was scant. Under the instant facts, the State also relied heavily on one key witness, Cunningham. However, on direct review, this Court found substantial corroboration:

> As to Randy Caldwell, the corroborating evidence consists of the two plastic jugs containing a kerosene type liquid which were found in his car and witnesses' testimony that they heard a loud sounding car leaving the mountain around 2:00 a.m. on the night of the fire. One witness testified that the car leaving the mountain sounded like Randy Caldwell's car which the witness had heard earlier in the day. As to Stevie Caldwell, the corroborating evidence consists of the pink cigarette lighter found on him the next day and Linville Roberts' testimony that Stevie Caldwell and Cunningham were at her house a few hours after the fire asking to use the phone because they had run out of gas. Further corroboration as to both defendants comes from Lester Bain's testimony that Randy Caldwell,

-19-

Stevie Caldwell, and Cunningham were together shortly before the fire started. The three were also found together the morning after the fire. Again, we point out that evidence of corroboration need not in itself be sufficient to support the conviction. It is the exclusive job of the jury, as triers of fact, to determine whether the accomplice's testimony was sufficiently supported by the corroborating evidence. This Court has held before that "presence, companionship, and conduct before and after the commission of the offense, are circumstances from which one's participation may be inferred." (Citations omitted)

State v. Caldwell, 977 S.W.2d at116.

Considering all the petitioners' allegations and witnesses in this regard and accrediting the trial counsels' testimony, we cannot conclude the alternative theory was viable or worthy of counsel's pursuit. Therefore, trial counsel was not ineffective in this respect.

## C. Additional Evidence/Independent Investigation

Next, Stevie Caldwell alleges counsel was ineffective for failure to produce additional evidence of benefit to the petitioner. Randy Caldwell alleges ineffectiveness due to counsel's failure to do an independent investigation. We will consider these issues jointly.

Sue Caldwell testified at the post-conviction hearing that she gave a pink cigarette lighter to "Rooster" at the jail to give to Lester Cunningham. A pink cigarette lighter had been seized from Stevie Caldwell after his arrest and was introduced as an exhibit in the trial as corroborative evidence. No connecting evidence was presented at post-conviction as to how Stevie Caldwell allegedly received the pink lighter that Sue Caldwell took to the jail. Linda Young, the petitioners' sister, confirmed that her mother took a cigarette lighter, pink to purple in color, to the jail. She also stated she told the petitioners' counsel of this months before trial. Stevie Caldwell's trial counsel stated he never heard of the incident until after the trial.

Kelcy Butler submitted an affidavit to the effect that he was coon hunting in the vicinity of the victim's house from 10:00 p.m. until 2:00 a.m. on the relevant night and saw no cars or people in the area. Stevie Caldwell's counsel stated he had never heard of Kelcy Butler prior to the post-conviction proceeding. The petitioners provide no guidance as to how counsel was to have gained knowledge of this information.

Olla June Young, the petitioners' aunt, testified she resided on the road leading to the victim's house and would have awakened had Randy Caldwell's car passed her house. She admitted she did not share this information with trial counsel, although she attended the second day of trial.

Reba Cunningham, grandmother of the petitioners and Lester Cunningham, submitted an affidavit that she observed Lester Cunningham discussing testimony with the State attorneys and State witnesses. The affidavit is non-specific as to time of the trial and unenlightening as to any prejudice to the petitioners.

-20-

The petitioners have not shown the trial counsel to be ineffective for failure to produce additional evidence or in their independent investigation.

## D. Impairment at Trial

Next, both petitioners claim that they were impaired by their ingestion of alcohol and Valium during the trial. None of their supporting witnesses at post-conviction gave testimony as to this claim. The only trial counsel questioned on this, Stevie's attorney, denied observing any impairment of his client. The post-conviction judge did not find these claims credible. We hold this allegation of counsels' ineffectiveness is without merit.

## E. Suppression Motion

Randy Caldwell next claims ineffective counsel due to a failure to file a suppression motion regarding the plastic jugs and the cigarette lighter introduced later at trial. While this may be a colorable claim, the issue was not developed in any fashion at the post-conviction hearing. Without testimony concerning the circumstances of the seizure, we are unable to divine whether a motion would have been successful if filed. Lacking this prerequisite, we cannot conclude that the petitioners were prejudiced by the inaction of counsel. See Brimmer v. State, 29 S.W.3d 497, 514-15 (Tenn. Crim. App. 1998).

The petitioners' trial counsel provided effective assistance, albeit the assistance did not conclude in a different result. The petitioners did not meet the requisite burden of showing that either attorney was ineffective and that the petitioners were prejudiced by any errors by trial counsel. For this reason, we dismiss this issue.

### IV. Conclusion

For the foregoing reasons, we affirm the decision of the post-conviction court.

_____
**JOHN EVERETT WILLIAMS, JUDGE**