**STATE of Tennessee, Appellee,**

v.

**Randy CALDWELL and Stevie W. Caldwell, Appellants.**

Court of Criminal Appeals of Tennessee, at Nashville.

Sept. 30, 1997.

Application for Permission to Appeal Denied by Supreme Court June 8, 1998.

James D. White, Jr., Celina (on Appeal), Christopher L. Cantrell, Smithville (at Trial), for Appellant Randy Caldwell.

Martelia T. Crawford, Cookeville (on Appeal), J. Hilton Conger, Smithville (at Trial), for Appellant Stevie W. Caldwell.

John Knox Walkup, Attorney General and Reporter, Daryl J. Brand, Asst. Attorney General, Nashville, William E. Gibson, District Attorney General, Anthony J. Craighead, Ben Fann, Asst. District Attorneys General, Cookeville, for Appellee.

## OPINION

PEAY, Judge.

The defendants were indicted in January 1995 on charges of felony murder, aggravated arson, and conspiracy to commit arson against personal property. On August 29, 1995, a jury convicted each of the defendants on all three counts. They each received a life sentence for the felony murder conviction, nineteen years for the aggravated arson conviction, and six months for the conspiracy to commit arson against personal property. In this appeal as of right, the defendants raise the following issues:

1. Whether the testimony of accomplice Lester Cunningham was sufficiently corroborated.

2. Whether the trial court erred in denying the defendants' motion for a new trial based on newly discovered evidence.

3. Whether the evidence was sufficient to convict Randy Caldwell of aggravated arson and felony murder.

4. Whether the trial court erred in ruling that Lester Cunningham's contradictory statements were not subject to the cancellation rule.

5. Whether the trial court erred in finding that convictions for both aggravated arson and felony murder did not violate double jeopardy.

After a review of the record and applicable law, we find that these issues lack merit. Therefore, we affirm the judgment of the court below.

## BACKGROUND FACTS

Luther Gist, a resident of Gum Springs Mountain in White County, died in the early morning hours of December 8, 1994, after his home literally burned to the ground. The defendants, brothers Randy and Stevie Caldwell, along with their cousin, Lester Cunningham, were arrested in connection with the fire. Cunningham, who was sixteen years old at the time of the trial, decided to testify against his cousins in exchange for the charges being dropped against him.

Prior to this decision and prior to trial, Cunningham, who was also known as "Boss" or "Boss Hog," had made several conflicting statements about his role and the role of the Caldwells in the death of the victim. When he was initially questioned by the police, Cunningham stated that on the night of the fire he had been at Randy Caldwell's house all night. Then, after extensive interrogation, Cunningham stated that he was with the Caldwells on the night of the fire and that Stevie Caldwell had burned the house. Cunningham's statement was captured on video tape and he retraced the entire evening on tape. The following January, however, Cunningham met with the defendants' attorneys and again said that he and the Caldwells had been fighting chickens on the night of the fire and that they did not leave the house. This statement was tape recorded, and the tape was played for the jury at the defendants' trial. On tape, Cunningham told the defense attorneys that his earlier statement in which he implicated the Caldwells had been a result of pressure he received while being questioned by the police. He said the police told him what to say and he then repeated it on the tape.

At trial, Cunningham returned to the version in which he admitted that he and the Caldwells had been the ones to set the fire. He testified that on the evening of December 7, 1994, he and the Caldwell brothers were planning to fight chickens when they discovered they needed some tape in order to tape the spurs on the chickens. The three of them then went to Bain's Grocery to purchase the tape. Some time after 10:00 p.m., they returned to Randy Caldwell's house to fight the chickens. Lester Bain, owner of the grocery, confirmed that the three of them

had come by his store shortly after 10:00 p.m. Upon returning to the house, the three began to fight the chickens. Cunningham testified that one chicken got away, leaving them unable to continue the fight. Cunningham further testified that they then decided to find another chicken. They decided to go to the victim's house because he was thought to have some chickens that belonged to the defendants. Cunningham testified that they had arrived at the victim's house around 11:15 p.m. According to Cunningham, Randy Caldwell parked his Oldsmobile Cutlass up the road from the victim's house rather than in his driveway. He testified that the reason for this was that the threesome was afraid the victim might shoot them for being at his house at such a late hour. Cunningham testified that he and the defendants had walked toward some hay bales in the victim's yard hoping to find some chickens. When they were unable to do so, Cunningham testified that they had then discussed burning some of the hay bales as a joke to scare the victim. He further testified that the defendants then decided to burn the house rather than the hay.

Cunningham testified that Randy Caldwell gave Stevie Caldwell some wadded up paper. Stevie Caldwell put some hay into the paper; then he and Cunningham waited while Randy Caldwell went back to his car to get a plastic jug which contained gasoline. Cunningham testified that after Stevie Caldwell poured gasoline on the bundle of hay and paper, Randy Caldwell returned to the car. Stevie Caldwell then approached the house with Cunningham right behind him. Stevie Caldwell then put the bundle in a window on the far end of the house and lit the bundle with a lighter he produced from his pocket. Cunningham testified that once they saw flames they ran back to the hay bales and ultimately back to the car. He further testified that the threesome then drove down the road and parked in a field so that they could see if the house caught on fire.

Cunningham testified that he and Stevie Caldwell then approached the house on foot so that they could get a better look at the flames. He testified that they were so close they could hear shotgun shells exploding. Randy Caldwell then left in his car and drove back down the mountain. Cunningham testi-

fied that he and Stevie Caldwell were then forced to feel their way down the mountain by going through a nearby wooded area. He testified that they would only go ten to twenty feet before stopping to rest. He estimated that it took them two to three hours to get to the bottom of the mountain. He testified that while making the trek through the woods, Stevie Caldwell threatened to kill him if he said anything about the fire. Cunningham testified that when he and Stevie Caldwell reached the bottom of the mountain, they went to Linville Roberts' house in order to use her phone. He testified that they had told Roberts they had run out of gas and needed to call Randy Caldwell to come get them. Cunningham and Stevie Caldwell eventually returned to Randy Caldwell's house later that morning. The police found all three at Randy Caldwell's house and took them in for questioning.

The three were questioned separately, and Cunningham originally told the police that he did not know anything about the fire. He testified that prior to being separated from the defendants, they had told him not to say anything to the police. Thus, in his first statement to the police, he denied having any knowledge about the fire. However, Cunningham testified that when he learned that his punishment would be the same as the defendants' punishment, he decided to tell the truth because he "ain't done nothing to get that." He testified that at the time he admitted that he and the defendants had been the ones to set the fire, no promises had been made to him about the charges against him being dropped.

In January, the month after the fire, Cunningham gave a different statement to the defendants' attorneys. The statement was taken at the home of Linda Gail Caldwell, sister of the defendants, while Cunningham was on the run after escaping from the group home where he had been placed. In this statement, he again denied having any knowledge of the fire and said that he and the defendants had been at Randy Caldwell's house all night. At trial, Cunningham explained that most of this statement was a lie. He testified that he was told to say his "confession" had been "hassled out" of him. He said the defendants had thought that if they had been hassled at the jail, they "could get out of [the charges]."

In the months before the trial, Cunningham, who was in state custody, wrote letters and made phone calls to Sue Caldwell, mother of the defendants. In these letters, he expressed his desire to get the family together and how much he missed the family. In one letter, he again told the story that on the night of the fire, he and the defendants had stayed at Randy Caldwell's house all night to fight chickens. During the phone calls to Ms. Caldwell, Cunningham also said that he and the defendants had nothing to do with the fire. At trial, Cunningham testified that he had said and written those things at a time when he did not plan to testify against the defendants. Since that time, however, he determined that it was in his best interests to simply tell the truth. He testified that the version of events he told the jury was in fact the truth.

At trial, the State offered the testimony of several witnesses in order to corroborate Cunningham's story. Linville Roberts, the woman whose phone Cunningham said he and Stevie Caldwell used on the morning of the fire, testified that the two came to her house around 3:00 a.m. She testified that she lived down the mountain from the victim's house. She further testified that by the way of the road, it would take only ten or fifteen minutes to walk from her house to the victim's house. Roberts testified that Stevie Caldwell had said something about being out of gas and that he had used her phone. She testified that Stevie Caldwell and Cunningham had left her house at about daylight. She said they simply walked away. Roberts also testified that the victim's house was more than seventy years old, that it had no running water, and that it was heated with wood.

Thomas K. Austin, chief of White County Rescue Squad, testified that he had seen the fire between 1:45 a.m. and 2:00 a.m. He testified that fire trucks arrived shortly thereafter, but that the house was already fully involved. He testified that the house literally burned to the ground, with only the chimney still intact. Austin further testified that the victim was found leaning against the base of the chimney in a sitting position; he was burned beyond recognition. The medi-

cal examiner's report revealed that the victim died of smoke inhalation.

Guy Goff, the chief criminal investigator for White County at that time, testified that he spoke with Stevie Caldwell the morning following the fire. He testified that Stevie Caldwell had told him that he heard about the fire from a relative and that he and Randy Caldwell went to see the fire around 3:30 a.m. However, Goff testified that other witnesses at the fire had seen Stevie around 6:00 a.m. rather than 3:30 a.m. Goff testified that he did not know whether Stevie Caldwell could tell time or not. Goff further testified that Stevie Caldwell said he had not run out of gas nor had he been walking anywhere lately. Goff also testified that a search of Randy Caldwell's car had revealed two plastic gallon jugs with a small portion of liquid which appeared to be flammable. A report from the TBI Crime Unit revealed that the jugs contained an accelerant in the kerosene range such as kerosene, fuel oil number one, some brands of charcoal starter, and some aviation fuel. Terry Hembree, a criminal investigator with the district attorney's office, testified that he had searched Stevie Caldwell the morning after the fire and found a pink cigarette lighter in his pocket, but he found no cigarettes.

Edward Bain, who lived about a mile from the victim, testified that in the early morning of December 8, he heard a car driving very fast down the mountain. He testified that around 1:50 a.m., a car with what sounded like a loud muffler came down from the dead end road. He did not actually see the car. Norman Roberts, who also lived near the victim, also testified that he heard a loud car at about 2:15 a.m. He testified that it sounded like a car with a glasspack muffler. He also testified that he had heard Randy Caldwell's car earlier that day and that the car that passed at 2:15 a.m. sounded like Randy Caldwell's car. However, Roberts did not actually see the car.

James Kenneth Robinson, a supervisor with White County Central Maintenance, testified that he had examined Randy Caldwell's car and determined that it had a glasspack or cherry bomb muffler. He further testified that such a muffler would make a distinctive, loud roaring or popping sound. However, he testified that he did not actually start Randy Caldwell's car and listen to its muffler. He also noted that the exhaust system on Randy Caldwell's car is fairly common.

The defendants offered no proof.

## I. SUFFICIENCY OF THE ACCOMPLICE TESTIMONY

The defendants contend that the evidence was insufficient to corroborate the testimony of Lester Cunningham. When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. *Cabbage*, 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973).

The rule is well settled in Tennessee that a defendant cannot be convicted on the uncorroborated testimony of an accomplice. *Sherrill v. State*, 204 Tenn. 427, 321 S.W.2d 811, 814 (1959). An accomplice is defined as "a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of a crime." *Clapp v. State*, 94 Tenn. 186, 30 S.W. 214, 216 (1895). To corroborate the testimony of an accomplice, "there should be some fact testified to, entirely independent of

the accomplice's evidence, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it." *Clapp*, 30 S.W. at 216. This corroboration must consist of some fact or circumstance which affects the identity of the defendant.

Such corroborative evidence "may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction" so long as it "fairly and legitimately tends to connect the defendant with the commission of the crime charged." *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim.App.1992), *quoting Hawkins v. State*, 4 Tenn.Crim.App. 121, 469 S.W.2d 515 (1971). Furthermore, the corroboration may be sufficient although the "evidence is slight and entitled, when standing alone, to but little consideration." *Id.* Whether an accomplice's testimony has been sufficiently corroborated is a question for the jury. *State v. Bigbee*, 885 S.W.2d 797, 804 (Tenn.1994).

As to Randy Caldwell, the corroborating evidence consists of the two plastic jugs containing a kerosene type liquid which were found in his car[1] and witnesses' testimony that they heard a loud sounding car leaving the mountain around 2:00 a.m. on the night of the fire. One witness testified that the car leaving the mountain sounded like Randy Caldwell's car which the witness had heard earlier in the day. As to Stevie Caldwell, the corroborating evidence consists of the pink cigarette lighter[2] found on him the next day and Linville Roberts' testimony that Stevie Caldwell and Cunningham were at her house a few hours after the fire asking to use the phone because they had run out of gas. Further corroboration as to both defendants comes from Lester Bain's testimony that Randy Caldwell, Stevie Caldwell, and Cunningham were together shortly before the fire was started. The three were also found together the morning after the fire. Again,

we point out that evidence of corroboration need not in itself be sufficient to support the conviction. It is the exclusive job of the jury, as triers of fact, to determine whether the accomplice's testimony was sufficiently supported by the corroborating evidence. *See State v. Bigbee*, 885 S.W.2d 797 (Tenn.1994). This Court has held before that "[p]resence, companionship, and conduct before and after the commission of the offense, are circumstances from which one's participation may be inferred." *State v. Eric Cordell Pendleton and Willie Lee Williams*, No. 87–189–III, Davidson County, 1988 WL 99743 (Tenn. Crim.App. filed Sept. 28, 1988, at Nashville), *perm. to appeal denied*, Dec. 27, 1988, *citing State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim.App.1982). *See also State v. Steven Dewayne Bolden*, No. 02C01–9502–CC–00053, Lake County, 1996 WL 417673 (Tenn. Crim.App. filed July 26, 1996, at Jackson), *perm. to appeal denied*, Dec. 30, 1996. Thus, we find that the defendants' contention that Cunningham's testimony was not sufficiently corroborated is without merit.

## II. NEWLY DISCOVERED EVIDENCE

The defendants contend that the trial court erred in denying their motion for a new trial. The defendants presented newly discovered evidence in the form of a witness who said she saw Cunningham in Sparta in the early morning of December 8, 1994, and a video-tape of Cunningham's sworn statement in which he stated he committed perjury during the trial.

In seeking a new trial based on newly discovered evidence, the defendants must establish (1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial. *See State v. Nichols*, 877 S.W.2d 722, 737 (Tenn.1994) (citing *State v. Goswick*, 656

---

1. The defendants argue that Cunningham's testimony that the jugs contained "gasoline" is inconsistent with the TBI report which indicated the jugs contained a kerosene type liquid. We find this "inconsistency" to be insignificant.

2. Cunningham described the lighter as "purplish, blue colored." The lighter produced at

trial was evidently more pink in color, but Cunningham was able to identify it as the one Stevie Caldwell had used the night of the fire. The defendants complain that the inconsistency about the lighter's color is of significance. We find that it is not.

S.W.2d 355, 358–360 (Tenn.1983)). In order to show reasonable diligence, the defendant must demonstrate that neither he [she] nor his [her] counsel had knowledge of the alleged newly discovered evidence prior to trial. *See Jones v. State,* 2 Tenn.Crim.App. 160, 452 S.W.2d 365, 367 (1970). Whether the trial court grants or denies a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge. *Hawkins v. State,* 220 Tenn. 383, 417 S.W.2d 774, 778 (1967).

▮ At the hearing for the motion for a new trial, Shannon McCormick testified that on the night of the fire, she was working at Humboldt Express in Sparta. She testified that her shift had ended at 11:30 p.m. but that she stayed later because she was scheduled to meet her boyfriend in Cookeville around 2:00 a.m. McCormick testified that at about 1:30 a.m., she had been leaving her office when she saw a car approaching the building. She said she then returned to the office out of fear. She testified that she soon recognized the driver of the car as "Boss" or Cunningham. She further testified that Cunningham had asked her to go riding with him, but that she had said no, and Cunningham had then left.

McCormick testified that she is a friend of Linda Caldwell, sister of the defendants. She testified that she had met Cunningham while visiting Linda Caldwell's home. She further testified that she had told Linda Caldwell about Cunningham's visit to Sparta sometime shortly after the defendants were convicted. She testified that she did not come forward sooner out of fear for her safety and her job.

In addressing the testimony of Ms. McCormick, the trial judge found that (1) the defendants' attorneys acted with reasonable diligence in that they had no real way of finding this evidence without McCormick coming forward; (2) that the evidence was material in that her testimony conflicted with that of Cunningham; and (3) that the evidence would not have changed the verdict had the jury heard McCormick's testimony. The trial judge explained that he did not feel this "impeaching evidence" would constitute grounds for a new trial because the evidence was unlikely to change the jury's verdict even if the jury had believed her testimony.

▮ When it appears that the newly discovered evidence can have no other effect than to "discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness," the trial court should not order a new trial "unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing that a different result at trial would necessarily follow." *State v. Rogers,* 703 S.W.2d 166, 169 (Tenn.Crim.App. 1985). In the case now before us, the trial court determined that McCormick's testimony was not convincing enough to change the outcome of the trial. As noted above, the decision to grant or deny a new trial on the basis of newly discovered evidence is a determination for the sound discretion of the trial court. Finding no abuse of that discretion, we see no reason to award the defendants a new trial based on McCormick's testimony.

▮ The defendants also sought a new trial based on a video taped statement that Cunningham gave to defense attorneys in January of 1996. In the video, Cunningham stated that he had lied at the defendants' trial and that he wanted to set the record straight by telling the truth. He stated that he had committed perjury at the trial because he had been told that if he implicated the defendants, he would be released from custody after the trial. At the time the video was taped, Cunningham was still being held in Woodland Hills.

At the hearing on the motion for new trial, however, Cunningham testified that he was lying when he taped the video for the defense attorneys. He testified that he had let Sue Caldwell talk him into making the tape. He testified that the version of events he told at the defendants' trial was the truth.

The trial court found that had the jury heard the video tape of Cunningham recanting his testimony it would not have made a difference. The jury had already heard an audio tape of Cunningham in which he denied that he or the defendants played any role in setting the victim's house on fire. Thus, the

jury had the opportunity to hear both of Cunningham's versions and then determine which one to believe. The jury believed that Cunningham was telling the truth at trial, thus, the video tape in question would have done nothing to change the outcome of the trial. The defendants' contention that the trial court should have granted them a new trial is without merit.

### III. SUFFICIENCY OF EVIDENCE AS TO RANDY CALDWELL

■ Defendant Randy Caldwell contends that the evidence was insufficient for a jury to find him guilty beyond a reasonable doubt of aggravated arson and felony murder. Having already determined that Cunningham's testimony, as an accomplice, was sufficiently corroborated, we now address the sufficiency of that evidence.

Tennessee Code Annotated § 39–14–302 defines aggravated arson as arson plus committing the offense when one or more persons is present in the structure or when any person suffers serious bodily injury as a result of the fire. Quite clearly, the aggravating factors have been met: the victim died of smoke inhalation as a result of the fire. The issue, therefore, is whether the evidence was sufficient to sustain a conviction for arson. Tennessee Code Annotated § 39–14–301 states that "[a] person commits an offense who knowingly damages any structure by means of fire or explosion: (1)without the consent of all persons who have a possessory, proprietary or security interest therein. . . ."

Randy Caldwell contends that the evidence was insufficient to prove that he knowingly damaged the victim's house by means of fire. We cannot agree. Cunningham testified that Randy and Stevie Caldwell had originally planned to just burn a hay bale, but then actually decided to burn the house instead. He further testified that he and Stevie Caldwell had waited by the hay bale while Randy Caldwell had returned to the car to retrieve the plastic jugs that contained gasoline. Cunningham also testified that Randy Caldwell had furnished Stevie Caldwell with the piece of paper that Stevie Caldwell used to hold some hay and the gasoline. Thus, we have no trouble concluding that the evidence

was sufficient to convict Randy Caldwell of aggravated arson. We note that Stevie Caldwell did not challenge the sufficiency of the evidence other than through the earlier issue concerning corroboration. Therefore, we find this issue to be without merit.

### IV. CANCELLATION RULE

■ The defendants next contend that the trial court erred in determining that Cunningham's contradictory statements were explained and corroborated by other evidence and therefore, not subject to the cancellation rule. It is true that Cunningham, at times, gave conflicting accounts of the evening of the fire. However, the trial court, at the hearing on the motion for a new trial, found that Cunningham's testimony was credible, that he had sufficiently explained the reason for the contradictions, and that he had been subjected to rigorous cross-examination. We agree.

■ The rule of law in Tennessee is that contradictory statements made by a witness as to the same fact can cancel each other out. *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 482 (Tenn.App.1978). However, this rule applies only when inconsistency in a witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence. *Taylor*, 573 S.W.2d at 483.

In the present case, Cunningham did not contradict himself while testifying at trial. The inconsistencies complained of by the defendants lie in the statements Cunningham gave to police and to defense attorneys prior to trial. At the trial, Cunningham sufficiently explained that he had been threatened and felt that he had to say that the defendants had not been involved in setting the fire. Furthermore, Cunningham's version of events was sufficiently corroborated as we discussed earlier in this opinion. Therefore, we find no merit to this issue.

### V. DOUBLE JEOPARDY

The defendants' final contention is that their convictions for aggravated arson and felony murder violated double jeopardy principles. They argue that arson is an element

of felony murder and, therefore, the same offense for double jeopardy purposes. We do not agree.

Tennessee case law makes it clear that double jeopardy principles do not preclude separate convictions and punishments for felony murder and the underlying felony. *State v. Blackburn,* 694 S.W.2d 934, 937 (Tenn.1985); *State v. Zirkle,* 910 S.W.2d 874, 890 (Tenn.Crim.App.1995); *Welch v. State,* 836 S.W.2d 586, 588–89 (Tenn.Crim.App. 1992). The trial court, relying on the above cases, correctly rejected the defendants' argument. This issue is without merit.

Thus, after a review of the record and applicable law, we conclude that the defendants' appeal is lacking in merit. Therefore, we affirm the judgment of the court below.

BARKER and SMITH, JJ., concur.