IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 2, 2004

## STATE OF TENNESSEE v. GERALD PENDLETON

**Direct Appeal from the Criminal Court for Shelby County
No. 02-00512   Bernie Weinman, Judge**

---

**No. W2003-03043-CCA-R3-CD  - Filed December 20, 2004**

---

A Shelby County jury convicted the Defendant of first degree felony murder, aggravated child abuse, aggravated child neglect, and perjury.  On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction for felony murder; and (2) he was denied a fair trial because an expert witness for the State did not disclose to the jury that the witness was himself the subject of a federal criminal investigation.  Finding no reversible error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Charles Waldman, Memphis, Tennessee, for the appellant, Gerald Pendleton.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jim Lammey and Valerie Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

In January 2002, the Defendant was indicted for one count of aggravated child abuse, one count of aggravated child neglect, and one count of felony murder.  In October 2002, the Defendant was indicted for aggravated perjury.  A Shelby County jury convicted the Defendant of felony murder, aggravated child abuse, aggravated child neglect, and perjury.  The trial court sentenced him to life imprisonment for the felony murder conviction, and  twenty years each for the aggravated child abuse and aggravated child neglect convictions, to be served concurrently with the life sentence.  The trial court sentenced the Defendant to eleven months and twenty-nine days for the perjury conviction, to be served consecutive to the aggravated child neglect conviction.

The following relevant evidence was presented at the Defendant's trial.  Camilya Wright

testified that she has two children, a son named J.W.,[1] and a daughter named K.W.,[2] who was also the Defendant's daughter. She testified that, on July 12, 2001, J.W. was two years old. She said that her relationship with the Defendant was "all right" until he lost his job and she told him, right after the 4th of July, that she was going to move back home to live with her mother. She testified that the Defendant said he was fine with that "but the expression on his face was like he was upset, angry." She said that, on July 12, 2001, she was working at Cingular Wireless Warehouse and she lived about forty to forty-five minutes from work. She testified that, on that morning, she left for work around 9:30 a.m. and when she left that morning, K.W. and the Defendant were still sleeping and J.W. was awake. She said that J.W. was "saying his A.B.C's," and she told him she was leaving and he should go back to sleep. Wright testified that the last time she saw J.W. before he died he looked normal and there were no bruises on him.

Wright testified that she came home right after work, on July 12, 2001, and she found the Defendant in the kitchen cleaning a pillow. The Defendant told her that "he had spanked [J.W.] for messing on the pillow." Wright testified that she had seen the Defendant spank J.W. before using his hand or a belt. She said that the Defendant then went outside to get a basket from her car, and she turned on the hallway light to "look in on [the children]." She testified that she and the Defendant went to bed around 11:30 p.m., and she said that she did not wake up during the night.

Wright testified that the Defendant woke her up at around 6:00 a.m. and he "told me there was something wrong with [J.W.]". She said that the Defendant was "holding him, shaking him, I guess trying to wake him up." She testified that the Defendant tried to revive J.W., and he told her to "go call 911," which she did. Wright testified that, during this time, the Defendant would not let her touch J.W., and the Defendant told her to get K.W. and go into the living room. She said that she then called her mother and "told her to come out there." Wright testified that a fire truck arrived and the emergency workers tried to give J.W. oxygen. An ambulance arrived a short time later. She said that the emergency workers took J.W. downstairs to the ambulance and then they told her "that he was already dead." Wright testified that, during this time, the Defendant was talking to the paramedics and the police officers that had arrived, but she did not hear these conversations.

Wright testified that she, the Defendant, and K.W. went to her mother's house. She said that the Defendant said that he had given J.W. "some Fletcher's Castoria because he . . . messed on the pillow." She testified that the Defendant said that he heard J.W. "squirming," and he went to see if he was doing alright. She said that the Defendant told her that he put J.W. "on the toilet" because he "thought maybe [J.W.] had to go to the bathroom." Wright testified that they stayed at her mother's house until the detectives called and told them to come to the police station.

On cross-examination, Wright testified that, when she first met the Defendant, J.W. was approximately ten months old. She said that she lived with her mother, the Defendant, J.W., and

---

[1]We will refer to the minor children by their initials.

[2]We will refer to the minor children by their initials.

K.W. at her mother's house for about four or five months. She testified that J.W. had had "bowel problems" since he was about one year old. She explained that this began when he changed from "infant milk to regular milk" because "[i]t would make [J.W.] constipated." Wright testified that, based on doctor's instructions, she and the Defendant gave J.W. Fletcher's Castoria sometimes. She said that when she and the Defendant moved to Millington, she would work and the Defendant would look after J.W. and K.W., and, if the Defendant was looking for a job, the Defendant's sister would watch the children.

Wright testified that, sometime before the 4th of July, the Defendant and J.W. told her that J.W. had slipped and fallen in the kitchen. She said that she would ask J.W. "if anyone hurt him" and "[J.W.] said he would tell [her] if anybody hurt him," but he never indicated that anyone had hurt him. Wright said that J.W. was with the Defendant for about eleven hours a day, five days a week. She said that, when the family moved to Millington, J.W. still had problems with "his bowel movements" but not as much because he was not drinking regular milk that often. She testified that, most often, the Defendant would feed J.W., and he was responsible for J.W.'s diet. She said that the Defendant was the primary care provider for about three months, and she felt comfortable about leaving him with the children.

Mike Johnson, an Emergency Medical Technician ("EMT") with the Millington Fire Department, testified that, on July 13, 2001, he responded to a call about a two-year old child, who he later determined was J.W., suffering from a "possible full arrest." He said that, when they arrived at the apartment, J.W. "was laying on the bed and he was not breathing. He was cool to the touch." He testified that he and another fireman began to perform CPR on J.W. until the ambulance arrived, and when the ambulance arrived, Johnson took J.W. to the ambulance. Johnson testified that the paramedic on the ambulance called a physician who told the paramedic "she could go ahead and stop CPR." He said that the police were called to the scene "[b]ecause of bruising . . . that was found on [J.W.] . . . [i]n the stomach area."

On cross-examination, Johnson testified that his station received the call because they were closest to the address, and it took about three minutes to arrive at the residence. He said that, when they first arrived, there was no "suspicion of any wrongdoing" and that they found J.W. on the bed. He testified that there was "some discolored stuff right there around [J.W.'s] mouth," which he guessed "was the castor oil." Johnson testified that he checked for a pulse, did not find one, but still thought that CPR might help. Johnson testified that he noticed bruising in the abdomen area, and "there were several places [of bruising] that we noticed in this area."

On re-direct examination, Johnson testified that he and other emergency personnel "started getting suspicious" after they got J.W. into the ambulance. He explained that he was not suspicious when he received this call because such calls are "pretty common." On re-cross examination, Johnson testified that he did not notice any bruising on J.W.'s forehead, and it was the bruising in the abdomen region that caused his suspicion about "who did what." He conceded that he was not trained to determine whether bruising was caused internally or externally.

Reed Johnson, an officer with the Millington Police Department, testified that he was working on the morning of July 13, 2001, and he was called to the Defendant's residence. He said that, when he got there, he saw an ambulance and a fire truck, and other emergency personnel told him that there was a two-year-old male that the paramedics were no longer giving CPR. Officer Johnson testified that he met with the Defendant who told him that, at about 1:00 a.m., J.W. woke up and told the Defendant that he had a sore stomach. He said that the Defendant said that he gave J.W. some Fletcher's Castoria and put J.W. on the toilet, and J.W. and the Defendant went back to sleep at about 2:00 a.m. He testified that he was the first police officer on the scene and, after "assess[ing] the situation," he called the detectives. Officer Johnson testified that he did not go into the apartment at any time. He said that he saw the child in the ambulance, but he did not go into the ambulance and he did not "notice anything about the child[.]"

On cross-examination, Officer Johnson testified that it is normal standard operating procedure in Millington to call a detective when a two-year-old child had died. On re-direct examination, Officer Johnson testified that it was normal procedure for the police to respond to any death. He said that his suspicions may have been raised because the Defendant repeated his story three or four times, which seemed as though he was "mak[ing] sure it was right." On re-cross examination, Officer Johnson testified that the Defendant repeated the same story to him and the lieutenant with the fire department. He said that the Defendant was speaking with the fire lieutenant when he arrived so he did not know who initiated that conversation and, since he was the first officer on the scene, he wanted to know what had happened.

Chris Stokes, a detective with the Millington Police Department , testified that, on July 13, 2001, he was called to the scene to investigate J.W.'s death. He said that, when he arrived, the fire department, ambulance, and two patrol cars were present and there was a two-year-old child in the ambulance that "had been pronounced dead." Detective Stokes testified that he looked at the child and, at first, did not notice anything, especially since the ambulance was dark. He said that he took photographs and, after they were developed, he noticed "bruises on the chest and stomach, mainly the stomach." He testified that, when he was at the crime scene, Ms. Wright, the child's mother, was present outside, and he went into the residence with the Defendant and Officer Reed Johnson. Detective Stokes testified that, inside the apartment, there were "blood stains or what appeared to be a brown stain on the bed where the child was on the pillow." He said that the Defendant said that he had given the child "some brown medicine . . . Fletcher's Castoria." Detective Stokes testified that a belt was found under the cushions of the couch at the Defendant's residence. He testified that the child was taken to the medical examiner's office, and he went back to the department to note what he had learned at the scene. He said that he spent about forty-five minutes at the scene.

Detective Stokes testified that, later that afternoon, he spoke with the medical examiner, after which, he spoke with Ms. Wright, the Defendant, and the Defendant's sister. He said that it is the Millington Police Department procedure to videotape statements, and there was a video camera in the room where the interviews are conducted. He testified that, when he talked with the Defendant, there were two other detectives present, Sergeant White and Sergeant Cross. Detective Stokes testified that, before interviewing the Defendant, he advised him of his rights, which was recorded

on the video. He said that the interview lasted almost two hours, and the Defendant was not under arrest at that time. He testified that he and his "co-case" officer, Sergeant White, were in contact with the Attorney General's Office and informed the Office of what information they had obtained. He said that the Attorney General's Office told them to arrest the Defendant about an hour after the Defendant left the station.

On cross-examination, Detective Stokes testified that this was his first homicide investigation. He said that, when he got to the scene, he first spoke to Officer Reed Johnson to find out what had happened. He explained that Officer Johnson told him that the fire department responded to a 911 call, and the police responded at the fire department's request after the child was pronounced dead. Detective Stokes testified that he looked at the child, and did not notice bruising on the abdomen. He said that he did not speak with Ms. Wright because she was "distraught," but he did speak with the Defendant who told him that he tried to do CPR on J.W. He testified that the Defendant showed him where everyone in the residence sleeps. He said that he did not see K.W. on the scene, but she may have been with her mother in the vehicle. Detective Stokes testified that, on the interview videotape, the Defendant told him that K.W. was a "buck wild sleeper." He testified that J.W. and K.W. slept together, according to the Defendant and Ms. Wright, in a small children's bed. He said that when they interviewed Ms. Wright, she was given Miranda warnings because "she was also one of the care givers of the child" and "a suspect at this point." He explained that both the Defendant and Ms. Wright were viewed as suspects, the Defendant's sister was not a suspect.

Detective Stokes testified that he spoke with the medical examiner, Dr. Cindy Gardner, who told him that the cause of death might be trauma to the abdomen and the head. He said that Dr. Gardner told him that the abdomen was filled with soup and macaroni and a two-year-old child has a small abdomen and it was "like a balloon bursting . . . ." He testified that he did not remember any other explanation "other than a hard trauma to that area." He said that he asked the medical examiner if a belt could have caused this injury and the examiner told him it could not be because it would "have to be some kind of force . . . some kind of weight." Detective Stokes testified that the TBI Lab analyzed the "brown stains" found on the pillow in J.W.'s room and, to his recollection, determined it to be blood. He said that, when he arrived at the scene, his first theory was that the child may have overdosed or ingested some poison because the fire department and medics on the scene "thought that the child had aspirated on the liquid during the night." He testified that, based on the medical examiner's conclusion, he thought there must have been a person that applied force to cause the ruptured abdomen, but he did not consider that person to be a child.

On re-direct examination, Detective Stokes testified that he first learned that the Defendant had spanked J.W. when he admitted to disciplining him on the videotape interview. He said that, based on what the Defendant told him, he had no reason to believe that the substance on the pillow was blood because it was the same color as the castor oil that the Defendant gave to J.W. He said that he asked the lab to test the pillow to see if castor oil was present and they said they could not. He testified that the bottle of castor oil that was in the house was still sealed. On re-cross examination, Detective Stokes testified that he did not ask the Defendant, Ms. Wright or the Defendant's sister to sign any documents waiving their rights, but "[i]t was all done on video."

William Graves, an officer with the Millington Police Department, testified that, on July 14, 2001, he arrested the Defendant and transported him to Millington Police Headquarters. He said that he and Lieutenant Estes read the Defendant his Miranda rights and had him sign a waiver form in his presence.

Dr. O'Brian Cleary ("O.C.") Smith, the head of the Forensic Pathology Division at the University of Tennessee and associate professor of pathology, testified, as an expert, that he is licensed to practice medicine in Tennessee and that one of his duties was to perform autopsies. He testified that he performed an autopsy on J.W. on July 13, 2001, and concluded that J.W. had died as a result of multiple injuries. He said that J.W.'s injuries consisted of head injuries and "predominately injuries to the abdominal area" including the rupture of the stomach. Dr. Smith testified that there was bruising on the "left brow of the head," as well as bruising around the left side of the chest and the right side of the abdomen. The doctor explained that there were three areas of bruising: the right side of the abdomen; below the rib cage; and "where the bottom of the rib cage meets the abdomen." He said that this bruising was "relatively recent" because there was a "recent hemorrhage" but no inflammation. He opined that the child did not live long enough for inflammation to occur. He testified that the "predominant injury" was a stomach rupture "in which compressive force had caused the stomach to burst releasing the stomach contents within the abdomen as well as causing bleeding to accumulate within the abdomen."

Dr. Smith testified that the abdomen swelled from about three cups of "fluid which was fecal seep from the inflamed or the irritated abdominal wall" that was caused by the ruptured stomach. He said that there was also bleeding of the pancreas and bruising of the intestines, "especially the large intestine." He explained that "[s]ome . . . blunt force" contacted J.W.'s abdominal wall with enough force as to bruise his intestines. Dr. Smith testified that he did not believe the force of a belt could have caused the injuries because "in order to achieve the compression that is necessary to rupture the stomach, there has to be a lot of pressure put on the abdominal wall." He explained that this force was more likely the result of a heavy object, rather than a light one," like a belt. He said that, had a belt caused J.W.'s injuries, J.W. would have had a scrape on the skin surface, which was not present, therefore the doctor "reject[ed]" the notion that a belt was the instrument which caused J.W.'s injuries.

Dr. Smith testified that J.W.'s injuries would have to be caused by "severe force and sometimes even massive force in order to cause damage this deep inside the abdominal cavity . . . ." He said that the abdomen "has to be compressed deeply enough" to cause the stomach to rupture. He testified that he did not believe that a ten month to a one-year-old child could have "feasibl[y]" caused this injury unless there were "greater specifics as to how a child of that age could deliver a blow of that force." Dr. Smith testified that the injuries would be consistent with some force inflicted from an adult with "[a] hand, a fist, a knee, a foot, something like that could produce it." He said that the symptoms of this type of injury would include, initially "tak[ing] a person's wind" and causing pain because the nerve endings that line the abdominal cavity are sensitive to pain. He testified that, when the stomach ruptures, the contents will "spill out" and these contents will contain acid. He testified that a person may not want to be moved in order to avoid further irritation. Dr.

Smith testified that a child may die within hours after receiving this type of injury, but it is difficult to state exactly how long it would take for death to occur. He said that he did not believe that this type of injury could come from CPR performed by trained professionals because the damage was too extensive, and "the compressions would be in entirely the wrong spot." Further, he testified that it appeared that the accumulation of fluid occurred before CPR had been applied. Dr. Smith testified that this rupture probably occurred within a short time after the child had a meal because a full stomach is "tense" making it "easier to rupture . . . ." He said that, because the abdominal skin is "elastic," it is possible to cause internal damage to the organs without leaving a surface mark.

On cross-examination, Dr. Smith testified that he could not state with certainty what time J.W. was struck, exactly what struck J.W., who struck him, or why he was struck. He testified that he could not say whether a fist or a foot caused the injury because he did not know. He said that, in order to produce damage, the object has to have weight and must be moving. He testified that he did not believe the injuries were caused by "lying on the child" because that would also result in further restrictions on the child's chest and his ability to breathe. Dr. Smith explained that this would lead to a condition known as "traumatic asphyxia" where there is bleeding in the whites of the eyes because of rupture of the blood vessels. He said that this condition causes a person to die because of failure to breathe. He testified that, based on the traumatic asphyxia cases he had seen, gastric rupture was not a component. He said that, since the instrumentality was not know, it was difficult to estimate whether the injuries occurred as a result of "one blow or several blows." He testified that it was possible for someone not trained in CPR to cause the bruising around the abdomen.

On re-direct examination, Dr. Smith testified that CPR applied at or near the time of death "would not show the degree of bleeding in the child's tissues. And it would not show the degree of inflammation which is the reaction of living tissue to an insult of some sort." He said that, based on the tissue examined, the injury had to occur "some hours" before CPR was applied. He testified that, based on his observations, J.W.'s injuries were consistent with an injury that occurred before 7:00 or 8:00 p.m. and before the child was found at 6:00 a.m. the next morning. He said that other variables to consider were that, at some point, the child goes into shock based on the lost fluid and this slows down the inflammatory process.

## II. Analysis

On appeal, the Defendant contends first that the evidence is insufficient to sustain his conviction for felony murder. Second, he contends that he was denied a fair trial because the State's expert witness did not disclose to the jury that the witness was himself the subject of a federal criminal investigation.

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn.

R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A conviction may be based entirely on circumstantial evidence where the facts are "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" State v. Reid, 91 S.W.3d 247, 277 (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). The jury decides the weight to be given to circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958) (citations omitted). While single facts, considered alone, may count for little weight, when all of the facts and circumstances are taken together, they can point the finger of guilt at the Defendant beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Further, "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions . . . for the jury." Marable, 203 Tenn. 440, 313 S.W.2d at 457; see also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

The Defendant contends that the evidence presented at trial is insufficient to sustain his conviction for first degree felony murder. Specifically, he asserts that the proof at trial showed that he had a close relationship with J.W. and that, when Ms. Wright asked, J.W. told her that he would tell her if someone hurt him, but J.W. never told his mother that anyone had hurt him. He asserts that the evidence at trial showed that he was an important part to the family, and Ms. Wright felt that the Defendant properly took care of the children. He contends that there is no evidence that he ever struck J.W. or when the injuries occurred.

First degree murder, as stated in part by Tennessee Code Annotated section 39-13-202(2) (2003), is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse, aggravated child neglect . . . ." Aggravated child abuse is when "[a] person

-8-

. . . commits the offense of child abuse or neglect as defined in § 39-15-401 and: (1) The act of abuse or neglect results in serious bodily injury to the child . . . ." Tenn. Code Ann. § 39-15-402(a)(1) (2003). Child abuse and neglect, defined by Tennessee Code Annotated section 39-15-401, is when "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare . . . ." Tenn. Code Ann. § 39-16-401(a) (2003).

We conclude that the evidence, viewed in the light most favorable to the State, is sufficient to support the Defendant's conviction. The evidence at trial showed that the Defendant was J.W.'s primary caretaker. Ms. Wright testified that the Defendant took care of J.W. on the day the child's injuries occurred. According to Dr. Smith, the injuries to the child occurred shortly after J.W. had eaten. Although the exact time that the injuries were inflicted could not be determined, Dr. Smith's testimony shows that the injuries occurred when only the Defendant and K.W. were present. Further, Dr. Smith's testimony shows that this type of injury was most likely caused by an adult and would require "severe . . . massive force" to cause a ruptured stomach. Dr. Smith testified that it was unlikely that this injury would be caused by another child, and, therefore, it is highly improbable that K.W., who was about one-year-old, would be capable of causing such injury. Accordingly, considering this evidence in the light most favorable to the State, we conclude that it is sufficient to sustain the Defendant's conviction for felony murder. This issue is without merit.

## B. Right to Fair Trial

The Defendant contends that he was denied the right to a fair trial. Specifically, he asserts that he was denied this right because the State's expert witness did not disclose to the jury that the witness was himself the subject of a federal criminal investigation.

Every criminal defendant is guaranteed the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution. Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). "To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). This fundamental principle of law is derived from the landmark United States Supreme Court case, Brady v. Maryland, 373 U.S. 83 (1963), in which the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The United States Supreme Court has also held that the prosecution must disclose evidence which could be used by an accused to impeach a witness. See Giglio v. United States, 405 U.S. 150 (1972); see also State v. Terrell Thomas, 2004 WL 2544682 (Tenn. Crim. App., at Knoxville, Nov. 10, 2004). Our Supreme Court has said, "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson, 38 S.W.3d at 55-56 (citing State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998)). Tennessee has adopted a four-prong test, and in order to establish a due process

violation under <u>Brady v. Maryland</u>, a defendant must establish the following:

(1) The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
(2) The State must have suppressed the information;
(3) The information must have been favorable to the accused; and
(4) The information must have been material.

<u>State v. Edgin</u>, 902 S.W.2d 387, 390 (Tenn. 1995); <u>see also</u> <u>State v. Brewer</u>, 932 S.W.2d 1, 26 (Tenn. Crim. App. 1996).

In the case under submission, the Defendant has failed to meet this standard. First, there is no evidence in the record before us that shows that Dr. Smith was the subject of a federal criminal investigation at the time of trial. Second, there is no evidence that the State knew of any federal criminal investigation regarding Dr. Smith and, therefore, there is no proof that the State suppressed any information concerning such an investigation. Third, the information regarding Dr. Smith's investigation that is included in the Defendant's reply brief, even if it had been presented as evidence to the trial court, is not material. In <u>Edgin</u>, the Tennessee Supreme Court reviewed whether information is material stating "there is constitutional error 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different.'" <u>Id.</u> (citations omitted). Further, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Edgin</u>, 902 S.W.2d at 390 (citations omitted). Therefore, since there is no evidence that the State was aware of this information, and since the information was not material, the Defendant cannot prevail on his claim that he was denied a fair trial on these grounds.

Finally, the Defendant contends that he is entitled to a new trial based on, essentially, newly discovered evidence because the State's expert witness, Dr. O.C. Smith, was indicted on February 10, 2004, approximately two months after his motion for new trial was denied. Newly discovered impeachment evidence generally will not be grounds for a new trial. "The decision to grant or deny a new trial on the basis of 'newly discovered' evidence rests within the sound discretion of the trial court." <u>State v. Arnold</u>, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986). With respect to the Defendant's claim that the court below erred in denying his motion for new trial, our standard of review is abuse of discretion. <u>State v. Meade</u>, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

In seeking a new trial based on newly discovered evidence, a defendant must establish three elements: (1) that he or she used "reasonable diligence" in attempting to discover the evidence; (2) the evidence is material; and (3) the evidence would have likely changed the result of the trial. <u>State v. Terrell Thomas</u>, No. E2003-02658-CCA-R3-CD, 2004 WL 2544682, at *7 (Tenn. Crim. App., at Knoxville, Nov. 10, 2004) (citing <u>State v. Goswick</u>, 656 S.W.2d 355, 358-60 (Tenn. 1983)); <u>see also</u> <u>State v. Caldwell</u>, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) . In order to meet "reasonable

diligence" a defendant must demonstrate that neither the defendant nor defense counsel had knowledge of the alleged newly discovered evidence prior to trial. Caldwell, 977 S.W.2d at 117 (citing Jones v. State, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970)).

In addition, when it appears that the newly discovered evidence "can have no other effect other than to 'discredit the testimony of a witness at the original trial, contradict a witness' statement or impeach a witness,'" the trial court generally should not order a new trial. Thomas, 2004 WL 2544682 at *7 (quoting State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985)); see also Caldwell, 977 S.W.2d at 117 . Only if the "impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal" should a new trial be ordered. State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) (citing Rogers, 703 S.W.2d at 169).

In the case before us, the trial court determined that, even though there was newspaper speculation regarding Dr. Smith, there was not "any proof that was sworn to before this Court that there's anything wrong or anything improper about anything that Dr. Smith has done . . . there's certainly nothing before this Court that there was anything wrong with the testimony." Furthermore, the trial court concluded that "the defense . . . agree[d] . . . [that the other medical examiner's] testimony . . .would be consistent with what Dr. Smith testified to begin with." Because we find no abuse of discretion on the part of the trial court, this issue is without merit.

### III.  Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE